Martin, Appellant, *v*. Martin.

Argued November 9, 1943.　Before KELLER, P. J., BALDRIGE, STADTFELD, RHODES, HIRT, KENWORTHEY and RENO, JJ.

*William T. Connor*, with him *John R. K. Scott* and *Hardie Scott*, for appellant.

*Mark E. Lefever,* with him *Robert G. Kelly* and *Conlen, LaBrum & Beechwood,* for appellee.

OPINION BY RENO, J., January 27, 1944:

The wife's libel, praying for a divorce a mensa et thoro, charged cruelties and indignities. Respondent did not file an answer, and offered no testimony except to deny the charge of his wife that he called her a 'fairy'. The master reported that libellant and her witness testified in an honest and truthful manner, and that, therefore, he found as facts in the case all of the testimony adduced by them, except that respondent called the libellant the vile epithet. Nevertheless, the master found against the wife, and the court below, overruling libellant's exceptions to the master's report, dismissed the libel.

The parties were married on June 20, 1925. No children were born of the union. Libellant testified that the parties lived in a fair degree of harmony for the first few years of their married life, though there was "mother-in-law interference from the start". The record as a whole discloses that the relations between libellant and her mother-in-law were always strained and that there was much ill-feeling involved. The libellant resisted attempts of the husband to induce her to move into the home of the mother-in-law. However, in 1932, libellant consented to move into the home of the mother-in-law with her husband, where she stayed about a year, "and things grew from bad to worse." There were constant quarrels between libellant and the mother-in-law, with the respondent invariably taking his mother's part. Bearing the situation no longer, but without being forced to do so, the wife removed to the home of a friend, where she remained about six weeks. In 1934, a reconciliation was effected and the parties moved into an apartment by themselves. However, though the scene changed, the quarreling and bickering continued

in an increased tempo, heightened by the fact that in the period between 1928 and 1932, while in Florida during the off-season in his work, respondent took to drinking. On one occasion, while in Florida, he allowed two drunken friends, business acquaintances of his, to attempt to get into the bathroom while she was there taking a bath, and when she remonstrated, he told her that they were business people with whom he had to get along.

Respondent, she testified, "told me to get the hell out and give him a divorce so that he could get someone that he loved, and that he could love, ...... and he cursed me and called me all kinds of names. He would get drunk, and he fell on me and he wet the bed, and he banged and slammed things around the morning [before] I left", which was on July 21, 1941. That morning, at breakfast, the respondent picked up a saucer of cereal and threw it against the wall beyond the libellant, saying that he never in his life hated anyone more than he hated libellant. She, thereupon, took her coat, saying she was going to leave the hell-hole, and went to the home of a friend, Laura M. Funk, whom she produced as a witness, where she still lived at the time of the hearings before the master. Thereafter, she returned to the respondent's apartment daily to attend to the household duties. On December 5, 1941, she received two letters from him to the effect that he would not be responsible for the apartment after December 15, 1941, and that she was to remove her effects.

Elaborating further, libellant testified that respondent habitually referred to her as bastard, whore, and fairy, dozens of times. Whenever he would get cross, about twice a week, he called her a bastard, his pet name for her. On six or eight occasions, he backed libellant against the wall, grabbed her by the wrists "until the blood was cut off," gritting his teeth at her

the while. She suffered no real pain, though. On one occasion, respondent crawled over the top of the dining room table after her. Respondent also accused her of going with other men, and, on five or six occasions, charged that she had been indulging in intercourse with her physician, until the latter died in 1932.

Libellant had an allergic condition which affected her like hay fever. When she sneezed, he would ask, "Where did that go?" He would ask her, when she started cooking, whether she had washed her hands. To add to her humiliation, he asserted that he had eaten more nasal discharges than anybody he knew.

As to the drinking by respondent, she testified that he would imbibe at night and then in the morning blow his breath into her face, asking her whether she could smell liquor on his breath. He would come in at night, put on the lights, make a great deal of noise, sit up and drink until 2:00 A. M. "just to aggravate me." For the last two years, the respondent drank excessivly, drinking a pint of whiskey a night for a while. The respondent after drinking excessively wet the bed on two occasions about six months prior to the separation. As a result of his mistreatment, libellant stated that she was not getting proper rest and that she lost weight, from 167 pounds to 138 pounds. During the last two years of their cohabitation, libellant refused intercourse with respondent. She stated that the only time he desired intercourse was when he was under the influence of liquor.

Mrs. Laura M. Funk, a witness for the libellant, corroborated to some extent the testimony of the libellant as to respondent's swearing, fault-finding, drinking, and quarrelsome nature.

After a careful consideration of the testimony, our independent judgment is that libellant has met the burden of proof and has established a case of indignities by clear and satisfactory evidence: *Hummel v.*

*Hummel,* 98 Pa. Superior Ct. 1. The record fails to substantiate the charge of cruel and barbarous treatment, for that ground requires proof of such conduct as endangers life or health and renders cohabitation unsafe: *Mentser v. Mentser,* 136 Pa. Superior Ct. 582, 7 A. 2d 541. The record discloses no real physical danger to libellant and she showed no apprehension of bodily harm. Quite to the contrary, when respondent threatened to knock her profane head off, she "told him he was too yellow".

The well-established definition of indignities clearly encompasses the behavior of the respondent in this case. Indignities may consist of vulgarity, unmerited reproach, habitual contumely, studied neglect, intentional incivility, manifest disdain, abusive language, malignant ridicule, and every other plain manifestation of settled hate and estrangement: *Evans v. Evans,* 152 Pa. Superior Ct. 257, 31 A. 2d 590; *Wittmer v. Wittmer,* 151 Pa. Superior Ct. 362, 30 A. 2d 174; *Viney v. Viney,* 151 Pa. Superior Ct. 86, 29 A. 2d 437. The essential feature of the offense of indignities to the person is that it must consist of a course of conduct or continued treatment which renders the condition of the innocent party intolerable and his or her life burdensome: *Esenwein v. Esenwein,* 312 Pa. 77, 167 A. 350; *Davidsen v. Davidsen,* 127 Pa. Superior Ct. 138, 191 A. 619.

The court below held: "The irregular acts of misconduct and abuse over such a long period of time as sixteen years are in our opinion insufficient to sustain the charges in the libel." But the record does reveal fixed and settled hate and permanent estrangement on the part of respondent toward libellant, and particularly during the period immediately preceding the separation. A spouse may tolerate and indeed overlook offensive conduct for many years; but when it continues undiminished, becomes increasingly worse and more regular; and the affronts to personality, the disturbance

of peace and the lack of repose cannot longer be endured, when at long last the limit is reached and life becomes burdensome, courts will not refuse relief merely because hate and estrangement, and the conduct engendered by them, have not been regularly manifested. Respondent's abuse, vulgarity, vituperation, incivility, and. ridicule of and toward libellant were exhibited throughout the greater part of the marriage, and constitute a course of conduct rendering the condition of the libellant intolerable and her life burdensome.

The decree dismissing the libel is reversed, the libel is reinstated and the record is remanded to the court below with directions to enter a decree of divorce a mensa et thoro and to fix the amount of the alimony.