## McKrell *v.* McKrell, Appellant.

Argued March 21, 1945. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON and JONES, JJ.

*W. T. Corbett,* for appellant.

*Ellsworth Jordan,* with him *James C. Tallant,* for appellee.

OPINION BY MR. JUSTICE PATTERSON, May 21, 1945:

This is an action for a divorce *a vinculo matrimonii* on the ground of indignities to the person by Harvey H. McKrell, appellee, against Frances Arline McKrell, appellant. The case was tried before a judge without a jury and the libel was dismissed. On appeal to the Superior Court the order was reversed and the record returned with a direction to enter a decree granting an absolute divorce. This Court allowed an appeal.

The parties were married November 19, 1925, at Wellsburg, West Virginia. Following the marriage they lived at Avalon, Pennsylvania. McKrell, then a store manager for the Atlantic and Pacific Tea Company, later attended and was graduated from a chiropractic college and a school of naturopathy. He was subsequently licensed by the Commonwealth of Pennsylvania as a naturopath and opened an office in his residence. Three children, all of whom are living, were born of the marriage. No differences of a serious nature were experienced, and the parties to this litigation, with their

three children, lived a normal happy life for seventeen years prior to June, 1941. Appellee prospered and family relations were harmonious. It was at this time that he secured the services of one Mrs. Eva McAnulty to assist him at the office. She was young and attractive, and studied at the Universal College of Chiropractics at Oakland. She acted as secretary and stenographer, aided in the adjustment of patients, and made laboratory tests. Immediately after she became his assistant appellee began to remain at his office until twelve and twelve-thirty in the morning. Rarely, if ever, was he at home with his family, putatively because both he and the assistant worked continuously, not only in the practice but also in the study of their profession. Appellant wife protested this course of conduct. After having been informed that they had been seen together in public late in the evening, and having seen them upon one occasion in front of a theatre, she began to doubt the truth of his explanation. McKrell never manifested any intention of discontinuing the apparent close association with Mrs. McAnulty. As a result of the tension thus created appellant became troubled and suspicious of his infidelity. She sought the aid of his sister in restoring their previous happy family life. On January 17, 1942, Dr. McKrell, without any explanation to appellant and without having provided for the maintenance and support of Mrs. McKrell and the children, left the family home and has never returned. Later he sent her $25 a week for the maintenance of herself and the three children. He has never attempted, directly or indirectly, to effect a reconciliation.[1] One year later, in January, 1943, he filed this libel in divorce.

---

[1] He testified, on cross examination (p. 46-A): "Q. You never attempted any reconciliation with your wife since? A. No. I have made an attempt to see the children but I was not very successful."

The course of conduct charged by appellee against appellant is as follows: Prior to June, 1941, appellant was continually nagging;[2] she made no effort to raise herself to the social standard which he was seeking to acquire;[3] and she failed to conduct herself properly in the presence of patients.[4] After June, 1941, when he se-

---

[2] "A. Nearly every mealtime, a hungering for money, and why didn't I do this and why didn't I do that? That is a long drawn-out affair which, however, due to the fact of the children and my standing in the community, I tried to bear that condition and came across as long as it was bearable, and lived a married life and conducted the home the best I could and saw my children were provided for. But, as far as being happy and harmonious, that is sort of an exaggeration": Page 54-a, Notes of testimony.

[3] "A. I believe this: that had my wife endeavored to bring herself to the standard which I was trying to acquire myself, that is, in social standing in the community and our activities and social life— they were confined to too low a level, if you know what I mean— I would have liked her to have made some effort to lift me up rather than to keep me from getting up. For the sake of yourself and the sake of endeavoring to be a decent citizen, you should try to elevate yourself in society. Now, the friends I acquired I was sometimes afraid to bring some of them home simply because I would lose my professional dignity. Q. You are telling me that as years went on you found your wife to be unable to meet the social standings you had set for yourself? A. No, I don't mean she was unable. I mean she made no effort to do it": Page 55-a, Notes of testimony.

[4] "A. Let me explain, if you will. I had a young married lady, and by that I mean between 30 and 35, I don't recall the age, but I was giving this lady treatments while I had my office at home. In giving cervical work, that is, cervical work on the bones in the cervical neck, the patient is lying with the face upward and I stand at the head of the table to make corrections. In giving any kind of an adjustment there is more or less little irritation noticed at the site of contact, which we attempt to remove by a little counter-irritating stimulus. After this patient left, and as she was going out the door, my wife said, 'I hope she liked that little pat on the cheek you gave her.' It is still a mystery to me how she looked through the key-hole and observed that I did that, but I didn't think it was a proper statement and I didn't think she should have even known it": Page 53-a, Notes of testimony.

cured Mrs. McAnulty as his assistant, appellant became jealous and suspicious regarding their true relationship. Mutual professional interests and an increased clientele required that they work together practically every night, and that they attend professional meetings. They returned home together and upon several occasions secured the use of a taxicab rather than walk. Their association was purely for business purposes and his habit of walking home with her every evening was a matter of courtesy, since she lived only a block and a half from the McKrell home. Appellant refused to believe his explanations and on one occasion accused him of being a "whoremaster" and a "dirty lowdown son of a bitch." Once she telephoned the assistant and called her a "hussy" and a "little whore", and upon another occasion came to the doctor's office and left a note in her typewriter, warning her to stay away from Dr. Mc-Krell.[5] This suspicion and distrust continued to increase. On June 22, 1942, upon returning home late at night from a fraternity initiation appellee found the bedroom door locked and he was denied admittance to the room. Subsequent thereto accusations became more frequent. Appellant attempted to prejudice the children against their father, and in their presence accused him of indecency and improper conduct with Mrs. Mc-Anulty. As a result of this conduct, appellee contends that his professional standing and health have been affected.

Appellant, Mrs. McKrell, denied that she interfered with her husband's professional practice and that she was unreasonably jealous. She was a good housekeeper

[5] "Evelyn—I am getting tired of the neighbors talking about you hanging after my husband so long, they even call me on the phone so if you want to stay healthy stop following him around like a puppy dog, he knows the way home without your assistance. I don't want to have to tell you again. If you are married act like it. If *I ever go to* court it will be too bad for you": Page 168-a, Notes of testimony.

and mother, and prior to 1941 was happy and contented. Before Mrs. McAnulty became his assistant appellee rarely, if ever, came home late at night.[6] She admits that as a result of her husband's aforesaid association with Mrs. McAnulty she became suspicious and made accusations intimating infidelity, but denied the same were ever made in the presence of the children or any person other than her husband. Prior to June, 1941, she regularly met appellee in the city on Thursday evenings and they had dinner and enjoyed a movie or a show. After that date this routine ceased. She, however, continued to spend Thursday evenings in town. Upon one occasion she saw appellee and his assistant in front of the Penn Theatre. Several witnesses testified they had seen the appellee and Mrs. McAnulty going into the theatre together. They had been seen together at other places. One, Hazel Wilkie, positively identified them as the couple she had seen "with their arms around each other's waists" on Euclid Avenue near Mrs. McAnulty's home.[7] Mrs. McKrell admitted calling the assistant on the telephone and telling her to stay away from her husband and that she wrote the note above referred to. The incident of the locked bedroom door was admitted. Appellant explained, however, that she was in great need of rest and, to prevent being disturbed by appellee's habitual arrival at a very late hour, locked the

[6] "A. He used to always make a point of being through at nine o'clock and lots and lots of times he was home by 9:30 and 10:00 o'clock in the evening": Page 132-a, Notes of testimony.

[7] "A. My husband and my daughter and I, and I saw the couple with their arms around each other's waists. I was especially attracted to it because she had on a white dress and his dark suit showed up against the white dress. That is what called my attention. I said to my daughter, 'Oh, there are a couple of love birds', and she said, 'That is Dr. McKrell and his nurse.' By that time we turned off Taylor onto Euclid and we turned to look and it was Dr. McKrell and the girl in his office": Page 157-a, Notes of testimony.

door. Although the door was locked only upon that one occasion appellee thereafter never expressed any desire to be in the room. Admitting that she had believed rumors regarding the impropriety of appellee's conduct and his infidelity, she testified at the trial that she did not then believe these rumors were true. She also desired a reconciliation for, despite the circumstances, she still regarded her husband with affection.[8] After having seen and heard the parties and their witnesses, the hearing judge entered a decree dismissing the libel.

The consideration which appellate courts are required to give to the conclusion of a hearing judge has been ably stated by Mr. Justice LINN in *Wick v. Wick,* 352 Pa. 25: "In determining which of the oral evidence to accept and which to reject, we lack the advantage possessed by the trial judge who, for several days, had the parties and witnesses before him, with ample opportunity to observe them during the trial. The findings of fact made by him have not the same effect on appeal as the verdict of a jury: *Esenwein v. Esenwein,* 312 Pa. 77, pages 80 and 81, 167 A. 350. Presumably, a trial judge's opportunity to observe the parties and witnesses during the trial, became the basis of a rule that 'when witnesses who are competent and equally interested, flatly contradict each other, the conclusion of the judge who heard them, as to which is to be believed, is not to be lightly disturbed.' *Krug v. Krug,* 22 Pa. Superior Ct. 572, 573; *Koontz v. Koontz,* 97 Pa. Superior Ct. 70; *Dearth v. Dearth,* 141 Pa. Superior Ct. 344, 15 A. 2d 37. In accord with that rule, we have at times resolved doubt in dealing with conflicting testimony, by relying on expressed or implied conclusions of the trial judge."

---

[8] "A. Well, I think when there are children involved—I think they should have a complete home. Q. Today what is your attitude toward having the family back together again? A. For the children's sake, yes. Q. Have you any affection left for your husband? A. Well, to be honest, I have, yes": Page 129-a, Notes of testimony.

"Indignities may consist of vulgarity, unmerited reproach, habitual contumely, studied neglect, intentional incivility, manifest disdain, abusive language, malignant ridicule, and every other plain manifestation of settled hate and estrangement: *Evans v. Evans*, 152 Pa. Superior Ct. 257, 31 A. 2d 590; *Wittmer v. Wittmer*, 151 Pa. Superior Ct. 362, 30 A. 2d 174; *Viney v. Viney*, 151 Pa. Superior Ct. 86, 29 A. 2d 437. The essential feature of the offense of indignities to the person is that it must consist of a course of conduct or continued treatment which renders the condition of the innocent party intolerable and his or her life burdensome: *Esenwein v. Esenwein*, 312 Pa. 77, 167 A. 350; *Davidsen v. Davidsen*, 127 Pa. Superior Ct. 138, 191 A. 619": *Martin v. Martin*, 154 Pa. Superior Ct. 313, 317. What is meant by such indignities is left undefined in the law, and depends largely upon the circumstances of each case; they must consist of such a course of conduct as is humiliating, degrading and inconsistent with the position and relation as a spouse. Cf. *Wick v. Wick*, supra, p. 28.

Appellee libellant has not established a case of sufficient merit to warrant the granting of a divorce. Alleged indignities occurring prior to 1941 are trivialities. They are isolated incidents with which the law is not concerned: *Esenwein v. Esenwein*, supra. Appellee's broad generalization that appellant interfered with his business is supported only by specific reference to one occasion when she read a magazine in his office, and by his conclusion that at one time she must have looked through a keyhole to see him treat a lady patient.[9] Ad-

---

[9] Illustrative of the generalization that Mrs. McKrell interfered with his business is the following excerpt (p. 21-a, notes of testimony): "Q. Explain what interferences, if any, the respondent, Frances Arline McKrell has caused to be made to the running of your business? A. As to professional courtesy due a professional man, it has been handled rather improperly, I would say, inasmuch as when my patients would become familiar with Mrs. McKrell, they

mittedly, her conduct had in no way injured his business; at no time had it received a set-back but, by his explanations, had increased to such an extent that he was required to spend each day and night at the office with his assistant.[10]

It is clearly established by the testimony of both parties that the disturbed marital relations which finally led to the filing of this suit had its inception in June of 1941 when Mrs. McAnulty became libellant's secretary and assistant.[11] The constant bickering and nagging,

invariably lost the normal professional courtesy due the office and, instead of becoming a doctor in their eyes, I became known by my first name. In other words there was nothing done whatever to add to but rather detract from the office. In addition to that was the interference with the female assistant. I have never had any assistant who met with her approval until after they were gone but during the time the assistant was in the office, why, they were subject to her will to a certain extent."

[10] Referring to the night association with the secretary, the doctor said (p. 44-a, notes of testimony) : "A. We make a point, we have a regular schedule to run until about 9:30 or 10:00 o'clock. However, there were occasions we go until 12:00 o'clock before we finish. Time is no criterion; as I said, we don't watch the clock. Q. There were occasions when you and your assistant stayed in the office until twelve and sometimes later? A. There were many occasions. In fact, it was very irregular that we were through at nine o'clock. That was most unusual. Q. Would there be patients there until twelve or one o'clock? No. Not always. Sometimes the patients would be through at nine o'clock."

[11] Appellee testified (p. 41-a, notes of testimony), as follows: "Q. So really the only difference between you and your wife was in 1942. That is when this thing came to a head? A. That is when the climax came. However, instead of making it a century of progress, long before this, naturally it was confined to as small a time as possible. If you would like further testimony, I will go back 17 years, if you wish. Q. Just answer the question. All the incidents you testified to on direct examination were in 1942? A. All that has been presented here of these particular incidents, that is right." The appellant, Mrs. McKrell, testified as follows (p. 111-a) : "Q. Mrs. Mc-Krell, approximately how long or approximately when did the first

directed primarily toward his failure to come home at night before twelve and one o'clock and toward his close association with his assistant during these evenings, when considered from the viewpoint of a faithful and devoted wife, cannot be said to constitute a course of treatment unprovoked by him. Attempts to convince her that his explanations were true and that his absence from the home was due entirely to expanding clientele and an obsession to continue the study of his profession must be considered with evidence showing him and his assistant together in public places and his failure in any degree to remove the cause of complaint by discontinuing this close association with her. Despite the protestations of Mrs. McKrell, appellee continued to champion the innocence of Mrs. McAnulty. Rather than ease the distressed mind of his wife, he chose to flaunt his attentions to his assistant before her. He assumed an attitude that the matrimonial difficulties stemmed from an unreasonably jealous and irrational wife and not from any act or course of conduct on his part. It would indeed be arbitrary to say that, in view of the continued association and rumors regarding the same, the fears of the appellant wife were wholly unfounded. Her statement at the trial, that she did not then believe the rumors and her suspicions regarding his infidelity were true, does not remove from this case the circumstances upon which her prior assumption had been based.

Appellee libellant has failed to establish unmerited reproach, habitual contumely, studied neglect, intentional incivility, malignant ridicule, or any other plain manifestation of settled hate and estrangement. He has not shown by clear and satisfactory evidence a course of conduct by her inconsistent with his relation and position as a spouse which has made his condition intoler-

---

difference arise between you and your husband? A. The most noticeable was in the last two years. Q. The two years immediately prior to the separation in January, 1943? A. Yes."

able and life burdensome. " 'In a proceeding dissolving a marriage contract, the case is not to be disposed of on a doubtful balance of the evidence nor upon unsubstantial inferences. There must be a presentation of a clear and satisfactory case on which the determination of the court may be confidently rested, and one who would win a case of this character must be clear of everything which is charged as a cause of separation against the opposite party; *Edmond's Appeal,* 57 Pa. 232; *Angier v. Angier,* 63 Pa. 450.' ": *Stein v. Stein,* 119 Pa. Superior Ct. 276, 278.

The evidence compels the conclusion that appellant is not entirely to blame for this marital tragedy. If, instead of rushing to defend himself and his assistant, appellee had attempted to understand the feeling of the woman who had been his faithful wife for over seventeen years and the mother of his three children, their common interests, ideals, love and affection could have remained unimpaired.

The decree of the Superior Court is reversed. The order of the court of common pleas dismissing the libel is reinstated and, so reinstated, is affirmed. Costs to be paid by appellee.