## McCauley *v.* McCauley, Appellant.

362

Argued March 19, 1957. Before RHODES, P. J., HIRT, GUNTHER, WRIGHT, WOODSIDE, and ERVIN, JJ. (WATKINS, J., absent).

*George A. Butler,* for appellant.

*Francis E. Marshall,* for appellee.

OPINION BY HIRT, J., October 1, 1957:

Plaintiff, a pilot in the American Air Force, was stationed in Germany when the parties were married in Wiesbaden on June 14, 1948. The defendant, a German by birth resided in Berlin. After the marriage

the parties remained in Germany until July 30, 1948 when they came to America. Following their arrival at Philadelphia they lived with plaintiff's mother in the home at 4532 Franklin Avenue. From there they went to the City of New York where they lived at various addresses until June 1949 when the defendant went back to Berlin and did not return for eleven months. In the interval the plaintiff remained in New York. On defendant's return in 1950 they lived on Long Island until February 7, 1951; plaintiff then was recalled to active duty at Randolph Air Force base in San Antonio, Texas. The defendant accompanied him and lived with him near the base in a house which they rented. When in June 19, 1951, the plaintiff was transferred to an Air Force base in California the defendant was unwilling to accompany him. She then left him and returned to Germany. The separation was final. On December 1, 1951 the plaintiff was ordered overseas to Japan and he was in active service from December 20, 1951 until February 17, 1953, stationed at Okinawa. At the end of the Korean hostilities he was assigned to Langley Air Force Base in Virginia and he is presently stationed there. Since the marriage in 1948 the parties have lived together a total of but 24 months.

The complaint in this case was filed on December 16, 1953 charging indignities and desertion; service on defendant was had in Europe by registered mail on January 6, 1954. A master was appointed and the defendant was given more than one month's notice of a hearing scheduled for May 4, 1954. When she indicated that she was without sufficient funds, but wished to defend the action, experienced and competent counsel was assigned to represent her through the Legal Aid Society of Philadelphia. Six hearings were had before the master between May 4, 1954 and February

8, 1955. Defendant did not appear in person at any of the hearings but at the last two her counsel cross-examined plaintiff thoroughly and at length. The master filed his report recommending a divorce which was approved by the court on March 14, 1955 and a rule for final decree was entered. During the pendency of the rule and prior to the return day, the defendant came to America and appeared in this action for the first time. On her request to be heard, the court referred the case back to the master on May 13, 1955. Thereafter eight additional hearings, attended by both the defendant and her counsel, were held. At the conclusion of the hearings the master filed a supplemental report, again recommending a divorce, but on the ground of indignities alone, and the court in accordance therewith entered a final decree on June 25, 1956, from which the defendant took the present appeal. After reading the entire record of the testimony, comprising 985 pages in the transcript, we are convinced that the charge of indignities has been sustained. We well might dispose of the issues, as did the lower court, by adopting the recommendation of the master based on his impartial and discriminating review and appraisal of the testimony. However, we will refer briefly to the questions raised by defendant's counsel, who has represented her well since appearing in her interest.

Here, as before the master, the defendant argues that the court was without jurisdiction, alleging that the plaintiff in bringing the action was not a bona fide resident of Pennsylvania. There is no merit in the contention. Plaintiff was born in Philadelphia and resided in his parents' home until he entered military service in 1942. His service in this country until February 8, 1944 was followed by thirteen months overseas duty in England. After his discharge from that

foreign service he returned to his Philadelphia home where he lived for more than a year; he then resumed military duty with the occupational force in Europe.

Five weeks after the marriage the parties came to the plaintiff's home in Philadelphia and lived there with his mother for 2½ months when they went to New York. Defendant, in Germany had some theatrical experience (from which however she apparently could not make a living—she was a dressmaker when plaintiff married her) and she aspired to a career on the stage in this country. Before the marriage she had induced plaintiff to convert a $5,000 investment, which he had made, into cash. And before leaving Germany the defendant intended, and plaintiff agreed, that they would go to New York, because of better opportunities there for satisfying her ambition to qualify for the stage. She, at plaintiff's expense, took singing and dancing instructions in New York until June 1949 when she returned to Germany. She was pregnant at the time and in Germany she submitted to an abortion because childbirth in her opinion would spoil her figure and would adversely affect her chances of a successful stage career. When she left New York for Germany, it was understood that she would return; in the meantime plaintiff lived in a single room at 67 West 78th Street in New York and continued his course in a business school in which he had enrolled. After the defendant returned, she also was employed in a dressmaking establishment and they lived in New York from June 1950 until February 1951. Plaintiff's legal residence was with his mother in Philadelphia and that was the place to which he always returned between military assignments. And his Pennsylvania residence was not abandoned when he went to New York. He went there, not with the intention of remaining, but at his wife's request and for the single purpose of enabling her to

obtain vocal and dancing instructions there. Plaintiff's employment in New York was casual and only to help defray living expense. He had a passion for the air service and he had every expectation of being recalled to it, as he was. Moreover the defendant also considered the mother's house in Philadelphia to be their legal residence for in registering an automobile while in Europe the latter part of 1953 she gave the Philadelphia address as the place of her residence. The following from *Anderson v. Miller,* 120 Pa. Superior Ct. 463, 182 A. 742, is pertinent to this phase of the case: " 'A domicile once acquired is presumed to continue until it is shown to have been changed. Where a change of domicile is alleged the burden of proving it rests upon the person making the allegation. To constitute the new domicile two things are indispensable: First, residence in the new locality; and, second, the intention to remain there. The change cannot be made except *facto et animo.* Both are alike necessary. Either without the other is insufficient. Mere absence from a fixed home, however long continued, cannot work the change': Mitchell v. U. S., 88 U. S. 350, 353. Also, see Price v. Price, 156 Pa. 617, 27 A. 291; Fry's Election Case, 71 Pa. 302." Plaintiff's legal residence still is in Philadelphia and the lower court clearly had jurisdiction of the action. Moreover, the fact that plaintiff was actively in the air service outside of Pennsylvania during a full one year period prior to filing his complaint is of no moment. Military service supplies the one exception to the rule requiring residence within the Commonwealth for at least one full year. *Nixon v. Nixon,* 329 Pa. 256, 198 A. 154.

The case was properly decided on the merits. Defendant admitted that plaintiff "didn't mistreat" her and all of the testimony is to the effect that he was reasonably considerate of her at all times. She con-

cedes that he made about six friendly telephone calls from his airbase in Texas while she was waiting in New York for passage back to Germany in June 1951. She had refused to accompany him when he was transferred to San Francisco and he testified that in these calls he pleaded with her not to return to Germany. There was no denial of his testimony to this effect. A number of the officers and wives of officers who were associated with the parties, socially and otherwise, at the various airbases were as one in testifying in effect that there was nothing in plaintiff's attitude toward his wife that would give her cause to leave him or to treat him as she did. He was not a party to the abortion. In fact shortly before she became pregnant he had consulted a physician in New York and he paid for his services in correcting a physical condition which had prevented her from having children. He consented to her return to Germany in 1949 and paid for her passage in deference to her then expressed desire that her child be born in Germany and not in America. And he understood that to be the sole purpose of her return to Germany on that occasion. Her mother arranged for the abortion after her arrival in Germany. The master properly resolved the conflict of testimony on this phase of the case against the defendant. And the record in its entirety clearly establishes that plaintiff was an innocent and injured spouse in seeking a divorce.

The charge of indignities is amply supported in this case by clear and satisfactory testimony of credible witnesses. The pattern of defendant's misconduct falls within the classic and oft-repeated definition of indignities, e.g. in *Martin v. Martin,* 154 Pa. Superior Ct. 313, 35 A. 2d 546. Beginning with her return from Germany to America in June 1951 defendant never ceased in her attempts to humiliate her husband. She called him a "pig" many times in the presence of other

officers and guests at social gatherings. On one such occasion she taunted him, saying "you're not a man, you're a mouse." At other times, and in public, she called him a "stupid blundering idiot", and referred to him as "puny", "small" and incapable of handling his affairs. She criticized him as if he were a child or (as suggested by the master) with the manner "of a superior person talking to a menial". Under the circumstances the epithets which came readily to her tongue were doubly humiliating because in military circles wives do not discipline their officer husbands in public, even under provocation—which however was wholly lacking in this case. Beginning with his service in Korea plaintiff had the rank of Captain and on many of the occasions when defendant criticized him it was in the presence of men under him in his command. Many times she called plaintiff "a dumkopf". She slapped him in the face on one occasion when he refused her demand that he apologize to her for taking her to a "Hot Dog Barbecue" when she expected better food. On another occasion prior to her final leaving she again slapped him and, screaming violently, seized him by the hair, and this at the officers' pool on the airbase in the presence of a large gathering. She complained to his commanding officer, much to plaintiff's embarrassment, that on another occasion he had attempted to strip her of her bathing suit at the pool where a large company had gathered. The truth of the matter is that she tried to kick him and in warding off the assault he unintentionally and wholly by accident loosened the strap of her suit. She attempted to justify her conduct in these instances, but her words do not carry conviction. The foregoing actions are illustrative of defendant's course of conduct, continuous over a long period of time.

Defendant often taunted the plaintiff with his "immaturity". She was a sophisticated Continental and, measured by her standards, the plaintiff undoubtedly was immature. We need not refer specifically to the incidents in this record evidencing the flexibility of her moral viewpoint and her sense of propriety. Going to her credibility, at least, there is the matter of the Ford automobile which she drove throughout Europe for a whole year after the final separation. She testified that a stranger whom she met quite casually on a bathing beach at Cannes turned the car over to her for her use wholly without any consideration moving from her. On cross-examination she stated that she did not know his full name, nor his address.

The conclusion is inevitable that the defendant had no intention of returning to America when she left for Germany in June 1951. She was frustrated by her failure to secure employment in show business in New York. This apparently was a ruling passion with her although her qualifications for a stage career may be doubted. She did not like America and considered German culture superior. In Germany when plaintiff married her she was a dressmaker and although since her last return to Germany she said that she had appeared as a professional singer and dancer there, yet according to her testimony, she had constantly sought other employment (but without success) to supplement the allotment of $150, or $100 per month, which the plaintiff had sent to her. Her credibility in stating that she was unable to obtain employment may be questioned because the aunt with whom she had traveled about in Europe with the borrowed automobile operated a dressmaking establishment with a number of employees and might have provided a job for her, possibly for the asking.

We well might accept the master's estimate of the credibility of the witnesses and particularly as to the extent to which the parties themselves are to be believed. We however have not relied upon the master entirely in that respect. Plaintiff was corroborated in many material respects by credible witnesses and was not discredited in his testimony when standing alone. Our independent conclusion from a reading of this entire record is that the charge of indignities has been made out by a clear preponderance of the credible evidence.

The decree of divorce on the ground of indignities is affirmed.