420 A.2d 1113

**William P. McCURRY**

**v.**

**Teresa M. McCURRY, Appellant.**

Superior Court of Pennsylvania.

Argued Nov. 12, 1979.

Filed June 20, 1980.

Reargument Denied Sept. 24, 1980.

William J. Murray, Pittsburgh, for appellant.

Robert L. Ceisler, Washington, for appellee.

Before SPAETH, HOFFMAN and VAN der VOORT, JJ.

SPAETH, Judge:

This is an action for support. The lower court ordered appellee to support his three children, but held that he was not obliged to support appellant, his wife and mother of the children.

The parties were married on September 4, 1965. Their children are Floyd, born in February, 1967, Douglas, born in April, 1970, and Maria, born in March, 1974. The parties separated on February 14, 1977, appellant taking custody of the children. On June 1, 1977, appellee filed a complaint in divorce. In response, on a date not in the record before us, appellant filed a petition for alimony pendente lite and counsel fees. Also, on September 9, 1977, she filed a complaint in support.

Appellant's petition for alimony pendente lite and counsel fees came before The Honorable Thomas D. GLADDEN. After hearing testimony on October 17, 1977, Judge GLADDEN filed an opinion and order on October 28. In his opinion the judge stated:

> When they were last living together [appellee] was providing [appellant] with $1,800 per month, out of which she was to pay for food, clothing and utilities for herself and the three children. He paid the mortgage, taxes, auto and house upkeep and maintenance.
>
> We see no reason why this arrangement should not continue. Since it is reported that he has agreed, on a

temporary basis, to pay $1,000 per month pending the outcome of a petition for support in the Domestic Relations Office, we will Order him to pay an additional $800 per month as Alimony Pendente Lite, or a grand total of $1,800 . . . .

. . . We find that [appellant] is entitled to reasonable counsel fees and will award $1,500 as partial counsel fees, without prejudice to her, to reapply to this Court, if necessary. So ordered.

Appellant's complaint in support came before The Honorable Charles G. SWEET, President Judge of the lower court. On February 3, 1978, Judge SWEET entered an order reciting, *inter alia*, that "[i]t seems that if we get into a hearing in this matter, it will be protracted and complicated because [appellee] is an accountant at a successful level and he has interests in earth moving machinery, a clothing store, and possibly other things." The order went on to provide that appellee should "pay $1,800 a month for four (4) months; to wit, February, March, April and May and that this case will be set, in case settlement has not been reached, for June 9, 1978 at 9:30 a. m." The order also included certain provisions regarding a tractor and the provision of automobile transportation for appellant and the children. The order concluded with the statement that "[s]eventy per cent (70%) of this package is deemed wife support and ten per cent (10%) for each child or thirty per cent (30%)."

A settlement of the case was not reached. Instead, on April 20, 1978, appellee filed a petition for modification of Judge SWEET's order of February 3. The petition alleged that because of appellant's actions, appellee had been forced to leave his employment as an accountant and was therefore unemployed and unable to make the ordered payments. Judge SWEET ordered a hearing to be held on the petition for modification on May 3, "all activity to stay meanwhile." A hearing was held on May 3, and further hearings on June 9, August 28, and October 17. In the course of these hearings, appellant presented a petition asking Judge SWEET to disqualify himself; testimony on this petition

was heard before the June 9 hearing.[1]  On November 6, oral arguments were heard.  On January 23, 1979, Judge SWEET entered the order that is the subject of this appeal. The order is in two parts.  The first part of the order directs appellee to pay $540 per month "for the support of his three children, retroactively to the 20th day of April 1978, with credit for amounts paid by him on account of said children." The second part of the order states that "no order is made for [appellant]."  The order recites two reasons for this denial of support:  that appellant "procured her husband's dismissal by his employer," and that "[appellee] has proven a case equivalent to a case in divorce."[2]

—1—

Generally, in a support proceeding the appellate court will defer to the lower court, reversing only for a clear abuse of discretion.  *Commonwealth ex rel. Hauptfuhrer v. Hauptfuhrer*, 226 Pa.Super. 301, 303, 310 A.2d 672, 673 (1973). This deference is accorded the lower court because it has seen and heard the witnesses.  *Commonwealth ex rel. Friedman v. Friedman*, 223 Pa.Super. 66, 67, 297 A.2d 158, 159 (allocatur refused, 223 Pa.Super. xxxv) (1972)).  However, our deference is not uncritical.  An order may represent an abuse of discretion if it misapplies the law.  *Girard Trust Bank v. Remick*, 215 Pa.Super. 375, 377, 258 A.2d 882, 884 (1969).  It is therefore our responsibility to be sure that in entering its order the lower court correctly applied the law. *Commonwealth ex rel. Kraus v. Kraus*, 185 Pa.Super. 167, 172, 138 A.2d 225, 227 (1958).  An order may also represent an abuse of discretion if it reaches a manifestly unreasonable result.  *Girard Trust Bank v. Remick, supra.*  This will

1.  The petition to disqualify alleged that Judge SWEET prejudged the case and that he should not have heard the case because of a conflict in interest.  It does not appear, so far as we can tell from the record transmitted to us, that Judge SWEET has ruled on the petition to disqualify.  It may be that the judge believes he has denied the petition, for after it was presented, he continued to hear the case and entered the order now before us on appeal.

2.  Meanwhile, by order of Judge GLADDEN, entered January 12, 1978, appellee's action in divorce had been discontinued.

be the case if the order is not supported by competent evidence. It is therefore also our responsibility to examine the evidence received by the lower court to be sure that the lower court's findings are supported by the evidence. Although we will accept and indeed regard ourselves as bound by the lower court's appraisal of a witness's credibility, *Commonwealth v. Goodyear*, 270 Pa.Super. 326, 411 A.2d 550 (1979); *Commonwealth ex rel. McQuiddy v. McQuiddy*, 238 Pa.Super. 390, 358 A.2d 102 (1976); *Commonwealth ex rel. Caplan v. Caplan*, 236 Pa.Super. 605, 346 A.2d 822 (1976); we are not obliged to accept a finding that is not supported by the evidence. *Commonwealth ex rel. Delbaugh v. Delbaugh*, 258 Pa.Super. 127, 392 A.2d 717 (1978); *Shuster v. Shuster*, 226 Pa.Super. 542, 323 A.2d 760 (1974).

Applying these principles to the present case, we have concluded that the first part of the lower court's order, directing appellee to pay $540 per month for the support of the children, must be reversed as not supported by the evidence, and that the second part, denying any support to appellant, must be reversed as being based on a misapplication of the law.

–2–

The lower court has not filed a separate opinion in explanation of its order. Instead, under the title, "Order," the court has filed what amounts to a combined order and opinion. The first paragraph of the order directs appellee to support his children, specifying the amount–$540 per month–and the effective date, and making provision for payment of any arrearages. The next two paragraphs of the order then explain or comment upon these directions. The first sentence of the fourth paragraph of the order denies any support to appellant. The balance of the paragraph and the next six paragraphs of the order then state the basis of this denial.

As regards the order for the support of the children, the lower court states, immediately after setting out the terms of the order: "In considering this order, it should be borne in mind that we have almost *no information* on [appellee's]

current ability to pay." The court then goes on to state as follows: that in 1975, 1976, and 1977 appellee "made substantial amounts of money;" that he "lost his job" in March 1978; that from January through April 1978 he paid $5,215; that in May, June, July, and August, 1978, he paid $525 per month; that "[w]hether there have been payments since then is unclear as the level of civility has deteriorated and the fog of litigation has descended obliterating easy access to information;" and that appellee "has an undivided half interest in a piece of real estate in this county variously described as worth $50,000 to $100,000 clear," and although appellee "has moved his person, personal effects and accounting business to Florida, there is enough equity in [this undivided half interest] to back up the order for a while."

These statements by the lower court require us to reverse its order, for in combination they amount to a statement, or an acknowledgment, by the court that its order is not supported by the evidence. If the lower court, after hearing and seeing the witnesses, found itself with "almost no information on [appellee's] current ability to pay," this court must perforce find itself with even less information.

There is an additional reason why we must reverse. Although stating that it had "almost no information," the lower court must have concluded that its order that appellant pay $540 per month for support of the children was fair, or else the court would not have entered the order. So far as we can tell, however, the court based this conclusion on too narrow a view of the evidence.

The only references by the lower court to appellee's assets appear in two sentences in the opinion: "In 1975, 1976 and 1977, he made substantial amounts of money . . . [Appellee] has an undivided half interest in a piece of real estate in this county variously described as worth $50,000 to $100,000 clear, over and above the mortgage." (Slip op. pp. 1–2) A review of the record indicates that there was substantially more evidence than this regarding appellee's assets.

Initially, it may be noted that appellee's own estimate of the value of the piece of real estate referred to by the lower court was rather considerably higher than the court's estimate. At the hearing on May 3, 1978, appellee testified as follows:

Q. Mr. McCurry, your house, you testified last year that it had a value of $140,000.00 here in Pittsburgh?

A. Yes.

Q. You owe the company $20,000.00 so therefore you have a net equity of $60,000.00 and Teresa has an equity of $60,000.00 is that correct?

A. Approximately, yes.

(5/3/78, N. T. 138).[3]

In addition, the record shows that appellee is extensively engaged in various business ventures. It appears that appellee and one Philip Stout borrowed $120,000 from the Mellon Bank with which they each bought a one third interest in a clothing store. (5/3/78, N. T. 62–65.) Also, it appears that appellee borrowed $80,000 from the Three Rivers Bank to buy a coal scraper for $88,800. (10/17/77, N. T. 6–7; 5/3/78, N. T. 135–36) Finally, it appears that appellee has moved to Florida with one Diane Greslin with the intention of pursuing his occupation as an accountant there. His testimony regarding this move included the following:

Q. Mr. McCurry, would you tell us the price that Diane Greslin paid for the house and all the furniture?

A. $150,000.00.

Q. So you're unemployed in Florida and your girlfriend you're living with bought a house for $150,000.00?

A. Yes, that is true. May I explain? I told you that I have a friend that is the Vice President of a bank. Diane's loan is arranged on a one–year note. She doesn't have to make any payments for one year on her loan. Then at that time it will be refinanced on a

3. At another point, appellee testified, "I have a house over here that's worth, I have an appraisal for $128,000.00" (5/13/78, N. T. 44).

permanent basis. So that there's a year's leeway. I hope and Diane is a very capable accountant; she's not down there; she's a very capable accountant and assistant to me, I hope that by a year's time we will be able to work out permanent financing. I hope that by a year's time that this mess is solved and that I will have some cash coming out of this

.    .    .    .    .

(5/3/78, N. T. 43–44.)

A. [Not in response to any question] May I say one more thing: When you talk about somebody lending me $150,000.00, the bank lent me that money because they had faith in my ability to pay it back. They didn't lend it to me, they lent it to Diane, but I guaranteed it. For our ability to pay the loan back, there is no way that in six months from now or a year from now, say to any banker that's been arranging lunches for me every day and breakfast and people for me to meet, say well I'm going [to leave Florida to return to Pennsylvania], I'll see you. I'm just not going to do that. Besides I think there's a big potential there. The area of Boca Raton is really a growing and developing area and I believe there's a great potential there.

Q. How soon is this potential going to develop?

A. If I knew that I wouldn't be so worried.

(5/3/78, N. T. 117.)

Without the benefit of findings of fact by the lower court, we are unable to say whether appellee's various ventures have been profitable, or what is the true extent of his assets. It is clear, however, that appellee's earning power is considerable. In 1974 he reported adjusted gross income of $60,808.30 (Reproduced Record, R–13); in 1975, $81,195.63 (*Id.*, R–12); and in 1976, $103,988.18 (*Id.*, R–11).[4] On re-

4. The record includes two federal income tax returns for 1977, one typed (R–9), and one handwritten (R–10). The typed return reports adjusted income of $38,517.88. Appellee testified, however, that the handwritten return was the return filed. (8/28/78 N. T. 93 *et seq.*)

mand it will be necessary for the lower court to unravel the apparent complexities of appellee's affairs and determine his assets, income, and earning capacity, so that his ability to pay support may be accurately assessed. In making this determination, the court will have to consider to what extent appellee's ability to pay support may be enhanced by corporate perquisites or contributions received from others. *See e. g., Commonwealth ex rel. Gitman v. Gitman*, 428 Pa. 379, 237 A.2d 181 (1967); *Commonwealth ex rel. ReDavid v. ReDavid*, 251 Pa.Super. 103, 380 A.2d 398 (1977); *Travitsky v. Travitsky*, 230 Pa.Super. 435, 326 A.2d 883 (1974); *Gutzeit v. Gutzeit*, 200 Pa.Super. 401, 189 A.2d 324 (1963).

–3–

Immediately after its order denying appellant any support, the lower court stated:

> I find as a fact that she procured her husband's dismissal by his employer, Michael D. Hanna. I think it is fairly clear that a wife who manages to get her husband fired from lucrative employment has forfeited her right to share therein.

(Slip op. at 3.)

We are unable to agree with the lower court's statement of the law. A wife does not forfeit her right to support *simply* because she "manages to get her husband fired." Rather, forfeiture will occur only if the wife's conduct in getting her husband fired would constitute cause for the husband to divorce her. *Commonwealth ex rel. Halderman v. Halderman*, 230 Pa.Super. 125, 326 A.2d 908 (1974); *Commonwealth ex rel. Rovner v. Rovner*, 177 Pa.Super. 122, 111 A.2d 160 (1955); *Commonwealth ex rel. Rankin v. Rankin*, 170 Pa.Super. 570, 87 A.2d 799 (1952). "What is meant by [the offense of] indignities is left undefined in the law, and depends largely on the circumstances of each case ...." *McKrell v. McKrell*, 352 Pa. 173, 180, 42 A.2d 609, 612 (1945). The "essential feature" of the offense is a

The copy of the handwritten return included in the reproduced record is illegible, but appears to report adjusted gross income of some $23,000.

course of conduct that renders the condition of the innocent party intolerable and his or her life burdensome. *Phipps v. Phipps*, 368 Pa. 291, 295, 81 A.2d 523, 525 (1951), *cert. denied* 342 U.S. 942, 72 S.Ct. 554, 69 L.Ed. 701. *And see Steinke v. Steinke*, 238 Pa.Super. 74, 357 A.2d 674 (1975) (concurring opinion, collecting cases). Accordingly, we have a double issue to decide: Does the evidence support the lower court's finding of fact that appellant procured appellee's dismissal? If so, does it further appear from the evidence that appellant's conduct in procuring appellee's dismissal represented a course of conduct that rendered the condition of appellee, as an innocent party, intolerable and his life burdensome?

■ Appellee testified that he was asked to resign from the M. Hanna Company, an accounting firm, because his employer, Michael D. Hanna, had received telephone calls from appellant threatening investigations of the Hanna Company. (5/3/78, N. T. 15) Two Hanna Company employees corroborated appellee's testimony. They testified that Mr. Hanna had told them that appellant had called and threatened to have the firm investigated and that he was concerned because, in the words of one of the employees, "he felt it would ruin him or destroy his business." (5/3/78, N. T. 80, 95.) A third Hanna Company employee also testified that appellant had called and made threats; however, when he was asked, "Mr. Hanna, did he at any time say that because of these calls I'm going to ask for Bill McCurry's resignation?", he replied: "At that time I believe Mr. McCurry had already resigned." (5/3/78, N. T. 92.)

Mr. Hanna himself testified, in part, as follows:

In all of the conversations I had with Teresa [appellant], which there were probably four, I can testify to three, but there could have been four. She always started out in a very excited state. But within a few minutes of our discussions and friendliness and our past friendship, she always did get to talking in a very nice manner and always with the idea that I'm never going to hurt you or your family. Teresa said that to me on several occasions. Factually, anytime that Teresa would make such a threat

like there's going to be an investigation and so on, it never concerned me very much. I mean, I've been investigated before and since Watergate it just seems to be the fashion. I never took those threats seriously.

(5/3/78, N. T. 50.)

Mr. Hanna also testified that appellee quit his employment without even informing him. "The circumstances of that was he didn't tell me he quit. He called Jimmy Bowman [Hanna's attorney] and he told Jimmy Bowman: I'm quitting, and the reason why I'm quitting is that Mike [Hanna] doesn't trust me anymore." (5/3/78, N. T. 52.) Mr. Hanna acknowledged that the parties' marital problems affected appellee's performance. When asked, "It is a fact is it not that according to your testimony that Bill's work suffered because of harassment he was getting from his wife?" he replied, "There no question." (5/3/78, N. T. 55.) Mr. Hanna also acknowledged that he had said to appellee: "Bill, I cannot sustain this any longer. I can't sustain what is happening. I'm sorry, Bill, but you would do yourself and me and everybody a favor, all the employees and everybody else, because there's more than one business concerned, if you turn in your resignation." (5/3/78, N. T. 55–56). When asked whether he had told his employees that appellant "was threatening and could ruin [his] business," Mr. Hanna replied, "I'm not saying that I didn't, but I would say that it was very unlikely that I did." (5/3/78, N. T. 58.) When asked, "You were willing to pay in advance without any repayment up to $25,000 to resolve this problem? Isn't that the figure you offered?" Mr. Hanna replied: "Anything that was necessary. There was no limit. I wanted to make these people . . . ." (5/3/78, N. T. 54–55.) At the end of Mr. Hanna's testimony, the following exchange occurred:

COURT: Did you let Mr. McCurry go because of inefficiency arising out of the business, or did you just let him go because of the fallout from his domestic problems?

A: I think it was a combination of the both, Your Honor.

(5/3/78, N. T. 59.)

Given the lower court's failure to make detailed findings of fact, we are at a disadvantage in considering this testimony. Taken at face value, it does not show that appellant procured appellee's dismissal; if Mr. Hanna is to be believed, appellee was not dismissed but quit his employment. It may be that the lower court did not find Mr. Hanna's testimony credible, or at least, did not find all of it credible. Some of Mr. Hanna's testimony, in particular his statement that he had been willing to pay "[a]nything that was necessary," may be read as inconsistent with his testimony that he did not take appellant's threats seriously. We should not have to speculate in this way about how the lower court appraised the testimony. However, if we assume that the lower court did reject Mr. Hanna's testimony, and decided that he fired appellee because of appellant's threatening calls, still, as a matter of law a case of indignities was not made out. Too many questions are left unanswered. We do not know how many calls there were. The testimony of two of the Hanna Company employees is to the effect that Mr. Hanna said he had received one call. (5/3/78, N. T. 80, 81, 88, 98.) The other employees referred to "the calls," without saying how many. (5/3/78, N. T. 91.) Nor do we know, if there was more than one call, over what period of time the calls occurred. The testimony of the Hanna Company employees seems to indicate that the call, or calls, occurred about Good Friday, 1978, for it was at a meeting on Good Friday that Mr. Hanna, according to the employees, discussed the call, or calls. (5/3/78, N. T. 80, 91, 95.) Thus, little, if any, more than a single incident was proved. To prove indignities, however, a course of conduct must be proved. *Phipps v. Phipps, supra.* One may assume that appellant's and appellee's marital difficulties adversely affected appellee's performance at work. This assumption made, however, the question remains, What were the nature of the marital difficulties, their cause, and their duration?

Appellee's counsel has cited no authority in support of the lower court's proposition that "a wife who manages to get her husband fired" forfeits her right to support, instead

simply stating, "[i]t is certainly not necessary to argue very long in support of the proposition." Appellee's Brief at 21.

The only case cited by the lower court in support of its proposition is *Friedrich v. Friedrich*, 31 D. & C.2d 488, *aff'd*, 202 Pa.Super. 37, 195 A.2d 371 (1963). That case, however, not only does not support but contradicts the court's proposition. There the court described the record as "replete with evidence that relatrix over the years has been guilty of various courses of conduct constituting indignities . . . ." 31 D. & C.2d at 489. Among these courses of conduct were "frequent" unfounded accusations of infidelity, "constant" and "almost interminable" abusive language, "never mak[ing] breakfasts" and "seldom prepar[ing] lunch," "threaten[ing] to cause trouble" with her husband's employer, and "[v]arious other continuing manifestations of her settled hate, estrangement and disdain." *Id.*, at 489–91. Thus in denying the wife support, the court in *Friedrich* did not rely on evidence of a single incident of interference with the husband's employment, but rather applied the settled principle that before indignities may be found, the proof must show a continuing course of conduct.

The lower court also quoted A. Momjian and N. Perlberger, Pennsylvania Family Law § 6.9.3(b) (1978), as stating that "wilful sabotage of the spouse's status on his or her job have also been held to be 'indignities' . . . ." If read as stating that a single incident of sabotage may constitute indignities, this statement is erroneous. It is evident from the context, however, that the authors did not intend their statement so to be read. In the sentence immediately preceding it, they refer to the "persistent course of conduct by a spouse" that may terminate the other spouse's duty of support. Also, the two cases they cite in support of their statement are *Friedrich v. Friedrich, supra,* and *Bailey v. Bailey,* 199 Pa.Super. 534, 185 A.2d 632 (1962). *Friedrich,* as just noted, recognizes, and emphasizes, that before indignities may be found, the proof must show a continuing course of conduct. The same is true of *Bailey,* where, after describing numerous incidents, we said that "[T]he record is replete

with evidence of that kind of a continuous and persistent course of conduct that demonstrated that the love and affection upon which the matrimonial status rests has been permanently replaced by hatred and estrangement, constituting indignities to the person as defined by this Court in a long line of cases." *Id.*, 199 Pa.Super. at 540, 185 A.2d at 634.

After its citation of *Friedrich*, the lower court stated: "In addition, I feel that she [appellant] has shown toward her husband as negative, intransigent and a hateful attitude as I have seen displayed by a wife in 15 years of Domestic Relations litigation." (Slip op. at 3.) The court then went on to cite authority for the well-settled proposition that a husband may refuse to support his wife if she has engaged in conduct that would entitle him to divorce her, and concluded with the statement: "I feel [appellee] has proven a case equivalent to a case in divorce and hence, absolve him of the duty of paying support to the woman." (Slip op. at 4.)

We have already discussed the evidence regarding appellant's threatening telephone calls to appellee's employer. Appellant also testified that during a confrontation in February 1978, appellant used obscene language in front of the children, accused him of having sexual relations with Diane Greslin, and struck him with a telephone book. (8/28/78, N. T. 17–27.) Appellee also testified that on another occasion, appellant told the children that he was not their father and that they were to use him "as a dollar bill." (8/28/78, N. T. 21–22.)

This evidence falls far short of proving the "continuous and persistent course of conduct," *Bailey v. Bailey, supra,* that must be shown before indignities may be found. The February 1978 confrontation occurred after the parties had separated and appellee had moved to an apartment. (8/28/78, N. T. 23.) The record does not disclose when the other incident occurred. It may also be noted that the record does not disclose that appellant's charge of infidelity

was without basis; we have already quoted testimony by appellee to the effect that he was living with Diane Greslin in a house they had bought in Florida. Accordingly, we are obliged to reject, as unsupported by the evidence, the lower court's conclusion that appellee proved "a case equivalent to a case in divorce, . . . absolv[ing] him of the duty of paying support to [appellant]."

–4–

■ We have mentioned above that appellant filed a petition asking President Judge SWEET to disqualify himself, and have said that we understand the judge to have denied the petition, for while he appears not to have ruled on it expressly, he did continue to hear the case and entered a final order. We find no reason to disturb the judge's disposition. In his opinion the judge states that "the level of civility has deteriorated," Slip op. at 2, and he is right; the transcript and the briefs include statements, by both counsel, that are inconsistent with the professional presentation of a case, and for which counsel might well be rebuked. The evidence does not support the allegations that the judge prejudged the case or should not have heard the case because of a conflict of interest. If at times the judge became impatient or short with counsel, he may be forgiven.

We do believe, however, that on remand the case should be heard by a different judge. As we have indicated above, on remand the hearing judge will have to untangle appellee's apparently somewhat involved affairs. This will require not only that counsel for both parties present their respective positions in a much more disciplined and professional manner than they have so far done, but also, in all probability, that issues of credibility will have to be resolved. We think we should not ask a judge to resolve issues of credibility when he has already expressed his opinion of one of the parties as having manifested a "negative, intransigent and hateful attitude" towards the other party. It will be better if the proceedings on remand start afresh.

The order of the lower court is reversed, and the case is remanded for further proceedings consistent with this opinion.

VAN der VOORT, J., concurs in the result.