Commonwealth ex rel. Gitman, Appellant, *v.* Gitman.

388

Argued January 5, 1967. Before Bell, C. J., Mus-
manno, Jones, Cohen, Eagen, O'Brien and Roberts,
JJ.

*David N. Bressler,* with him *Harry Shapiro,* for ap-
pellant.

*Donald D. Dolbin,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, July 25, 1967:
As the result of an action instituted in the Court of
Quarter Sessions of Schuylkill County, Alfred Gitman
was ordered to pay, for the support of his wife, Nancy
Gitman, and their three children, $12,000 a year. Mrs.
Gitman appealed to the Superior Court, claiming in-
adequacy in the order. The Superior Court affirmed,
and, upon petition for allocatur, we allowed an appeal
to this Court.

Mrs. Gitman contends that the court below, in arriving at the amount of the support order, committed a manifest abuse of discretion in that it disregarded certain evidence which, if considered, would have dictated a much higher order. A reading of the record demonstrates quite convincingly that the court below failed to comprehend the extent of the husband's earnings. The income tax returns introduced into evidence showed that Mr. Gitman's net income, after taxes, amounted respectively, for the years, 1962, 1963, and 1964, to $32,489.29, $32,474.62, and $33,866.34. Much of this income derived from the Ashland Shirt Corporation, a closed family corporation of which Alfred Gitman was secretary-treasurer and one of its directors, in addition to being owner of 50% of its stock. The other half was owned by his twin brother. Another, and smaller portion of Gitman's income was derived from the Salem Mountain Corporation, also a closed family corporation with a total of 100 outstanding shares, of which Gitman owned 5, his twin brother 5, their brother Leo 5, and the Ashland Shirt Corporation 40, the remaining 45 being owned by their deceased father's estate, of which Gitman possessed a 3/10ths interest. Then, there was a third family corporation, the Fleetwood Shirt Corporation, of which Gitman was president and one of four directors, as well as owner of 10 of its 128 outstanding shares.

The court below failed to consider that some of Gitman's personal living expenses were absorbed by these corporations and that, to that extent, his income was augmented. The case of *Commonwealth ex rel. Gutzeit v. Gutzeit*, 200 Pa. Superior Ct. 401, should have offered the lower court some guidance in determining the realities of Gitman's income, in arriving at the amount the law compelled him to pay in discharging the obligation of supporting his wife and children. In that case the defaulting husband was an officer in a

corporation which provided him with a Cadillac automobile and a cabin cruiser, he traveled and entertained extensively, all of which luxuries he enjoyed at company expense. He lived with his 31-year-old son whose income emanated entirely from the defendant's company, paying no board or room rent. He enjoyed, at company expense, trips to Nevada, Florida and Europe. The corporation paid premiums on a $25,000 life insurance policy for the defendant. After enumerating these perquisites to the defendant's income, the Superior Court said: "What then is the defendant's earning capacity? . . . The only fair inference which can be drawn from the evidence is that the charges made to the corporation by the defendant, even though they may be legal deductions for corporate income tax purposes, constitute substantial perquisites to the defendant. All these must be considered in determining the defendant's earning capacity. It is evident that his salary, his corporate earnings, his life insurance, his direct perquisites from the corporation and his indirect perquisites obtained by living with his son in luxurious circumstances financed through his corporation would justify a finding that his earning capacity is at least $30,000 a year."

Another case shedding illumination to guide a court in determining income for the purpose of ordering support money is *Commonwealth v. Miller*, 202 Pa. Superior Ct. 573, where the Court said: "It is evident, however, that the defendant received commissions and other business income of over $47,000 in 1962 and a larger sum in other years; that he resides in a house valued at over $55,000 from which he conducts his business; that there is charged to business . . . an El Dorado Convertible Cadillac and a Chrysler automobile (both now with high mileage) and that club dues, florist's bills, luncheon bills, and similar expenditures were deducted as business expenses prior to arriving

at the net profit. Like the exemptions he claimed for his four sons, these items may have been proper deductions under the income tax law, but consideration must be given in a support case to those deductible expenditures which improve the defendant's standard of living and have the effect of perquisites."

It devolved upon the court below, therefore, in accordance with these decisions, to make a thorough study of all of Gitman's living expenses charged off to his corporation. This it failed to do. The court erred also in failing to make a study of the true worth and value of Gitman's interests in the three family corporations. According to his own calculation, Gitman's net worth amounted to at least $263,162.35, this based on the book value of his stock in the three family corporations. The market value is much higher than the book value. It was made clear in *Gutzeit v. Gutzeit,* supra, that, in determining a husband-father's financial obligation to his wife and children, the court must make a thorough appraisal of the defendant's stock interest and, in making that appraisal, consideration must be given to the corporation's good will and retained earnings. All this the court below neglected to do in the instant case.

The record showed also that, aside from Gitman's interests in the closed corporations, he owned at least an additional $100,000 of assets comprised of stock in three other corporations, an investment club, government bonds, Israel bonds and savings accounts. All this apparently escaped the lower court's attention or consideration.

Gitman lives in a luxurious $75,000-$80,000 residence previously occupied by the entire family. Although this property was held by him and his wife as tenants by the entireties, his interest was an asset to be considered in determining the monetary extent of his holdings.

In *Commonwealth ex rel. DiVirgilio v. DiVirgilio,*
182 Pa. Superior Ct. 475, it was held that the husband's
interest in property held by the entireties was subject
to execution for support payments due the wife, the
Court stating: "Pertinent and applicable here is the
following statement of Chief Justice STERN in Crane
v. Crane, 373 Pa. 1, 95 A. 2d 199: 'The husband cer-
tainly has an interest in all property owned as tenants
by the entireties, and there is no reason why that inter-
est should not be applied to the support of the wife
whom he has deserted . . . Accordingly, after an order
shall have been made by the court for plaintiff's main-
tenance it may be implemented by proceedings which
will enable her to enforce it by liquidation of the shares
of stock and the accumulated dividends thereon owned
by them as tenants by the entireties so as to enable her
to obtain satisfaction out of her husband's interest
therein.' Moreover, the order of the court below car-
ries out the policy of the law to make all of a husband's
resources available for the support of his wife and
family. Com. v. Mooney, 172 Pa. Superior Ct. 30, 92
A. 2d 258."

Certainly if a husband's interest in property held by
the entireties is subject to execution for support pay-
ments, it necessarily follows that such an asset should
be considered in determining the amount of support
payable to his wife. If it is an asset available for the
wife's support for purposes of execution, a fortiori, it
is an asset available for the wife's support when deter-
mining the amount thereof.

The fact that the husband lives rent-free in the
property held by the entireties is also to be considered
in determining what resources are available for the
wife's support, for this decreases the husband's living
expenses. In *Com. ex rel. Mooney v. Mooney,* 183 Pa.
Superior Ct. 107, the court emphasized: "The appel-
lant and his accountant testified that the purchase

price of the real estate held by the appellant and his wife as tenants by the entireties in which the taproom is located and above which there is an apartment occupied by the appellant was $44,000.00 upon which there is a mortgage of about $15,000.00. He pays no rent for the taproom or apartment although he pays the taxes thereon."

The husband's payment of the mortgage on the property is to be considered as increasing his equity in the real estate: *Commonwealth v. Miller,* 202 Pa. Superior Ct. 573 at 578.

So, also, any payments made on account of bank loans procured for the purpose of financing purchase of stock from corporations should be regarded as increasing the husband's worth rather than decreasing it. As reasoned in *Commonwealth ex rel. Zappasodi v. Zappasodi,* 196 Pa. Superior Ct. 488: "The item of $143 weekly, which the defendant claims is a fixed required expenditure, was not itemized or explained sufficiently to be accepted at face value. So far as appears these payments, for the most part, represent capital additions which will increase the defendant's equity in his business and are not necessarily deductible from the defendant's gross income in determining the proper figure upon which a support order should be based. Com. ex rel. Betz v. Betz, 127 Pa. Superior Ct. 98 at 103, 193 A. 338 at 340 (1937)."

In *Com. ex rel. Rankin v. Rankin,* 170 Pa. Superior Ct. 570, the Court stated that "a wife is not necessarily concluded by the amount of her husband's taxable income as computed in his Federal Income Tax return." In that case, the husband deducted $8,926.07 for depreciation on real estate. The Court said: "Such deduction for annual depreciation of real estate by a taxpayer is proper in determining the amount of net income subject to the tax. But although the Internal Revenue Code sanctions deductions for depreciation of

income-producing real estate such depreciation does not reduce the actual dollar income of the taxpayer, and does not enter into a computation of a husband's total income upon which a support order may be based. A man's first duty is to his wife and only actual business expenses may be deducted to determine his income to which she may look for her support. . . In any view the amount of the order is justified by the large capital resources of the respondent, considered in conjunction with his actual income."

In arriving at the amount a mother and children need in order to live properly, the court below seemed to be of the belief that so long as they were assured a roof over their heads, sufficient raiment and adequate food on the table, the husband-father had met his obligations of support. This reasoning is an erroneous one. If the husband-father can afford for himself a caviar-champagne standard of living, it is not justice, nor legal, that the wife should be content with a tent and bread-and-butter menu for herself and brood. Dignity of living, commensurate with income, is as much a necessity as the bare essentials for survival. The court should have considered the style of living to which Gitman had accustomed his family and the manner of his present living and compared it with the low standard of living to which he had reduced his wife and children because of his failure to meet his marital obligations. Gitman continues to live well and even luxuriously but his wife and three children must be content with a two-room hotel accommodation without kitchen or laundry facilities. This, in the face of the record, is not equity—morally or legally.

In *Com. ex rel. Rankin v. Rankin,* supra, the Court said: "Relatrix now has an apartment to furnish and maintain. In seeking support she is not restricted to the cost of bare necessities. She is entitled to an award sufficient for her 'comfortable support and mainte-

nance' consistent in amount with respondent's income and station in life."

The function of a court in a proceeding for support is not to punish a husband for misconduct but to fix an amount which is " 'reasonable and proper for the comfortable support and maintenance of . . . [his] wife.' " *Com. ex rel. Milne v. Milne*, 150 Pa. Superior Ct. 606. "[I]n determining the appropriate amount of the order the court is not restricted to the husband's actual earnings, but may also consider his earning power (McMahon v. McMahon, 167 Pa. Superior Ct. 51; Commonwealth v. Gleason, 166 Pa. Superior Ct. 506) and the nature and extent of his property and other financial resources.": *Com. ex rel. Rankin v. Rankin*, 170 Pa. Superior Ct. 570, 572.

Instead of comparing Mrs. Gitman's mode of living with her husband at the time they lived together, with the straits to which she was reduced after they separated, the court compared her lot in life before marriage with the opulent state into which she moved on marriage. It would seem that the court, in this regard, assumed that a Cinderella existence was Mrs. Gitman's normal status and that, with the sounding of the midnight hour of separation, the coach and six in which she had been riding should revert back to a pumpkin shell, and she must again be content to sit on a stool by the cinders of the fireplace. This assumption, however, fortunately for humanity, does not agree with the law. A man who elevates a girl, through marriage, to the plateau of a comfortable and even a richly elegant living, may not, when they separate, topple her into a base economic state on the theory that she is now no worse off than before she accompanied him to the marriage altar. It is the standard of living to which a family becomes accustomed that governs the calculation of a proper support order, consistent, of course, always, with the husband-father's income and assets. Even a

few years can permit one to become accustomed to a standard of living not previously experienced.

Mr. Gitman obviously continues to enjoy an affluent and extravagant standard of living, occupying an elaborate home, the expense of maintenance of which, he himself admits, amounts to $7,400 annually. All this while his wife and three children forlornly crowd into a two-room hotel accommodation.

It would appear that the court was influenced in its fixing of the support order by its assumption that Mrs. Gitman was not justified in remaining away from her husband. The court said: "During the trial of this case, the Court interrupted a hearing when the Prosecutrix was on the witness stand, and asked her if it were possible, for the sake of her three children, to return to her home and again live with her husband. The Court believed that these three children needed the guidance that only a Jewish father gives to his children. She, however, replied in the negative. As a result, from December 16, 1964, the Prosecutrix and their three children have been living in two rooms with two bathrooms, at the Necho Allen Hotel, Pottsville, Pa."

This statement was punitively irrelevant because Mr. Gitman did not question Mrs. Gitman's right to support from him. When Mrs. Gitman gave her reasons for leaving her husband, Mr. Gitman, for reasons of his own, did not choose to contest those reasons. Nothing was gained by the court's raising the curtain on a domestic scene which added nothing to the issue before the court.

The court seemed to be somewhat disturbed over the fact that Mrs. Gitman could not recall how many suits Mr. Gitman owned nor how many bathing suits she had purchased during the years for her children. It was an unnecessary vexation because it might have been more incredible if Mrs. Gitman had recalled with exactness such indecisive details.

The court also treated disparagingly Mrs. Gitman's attempted inclusion of her husband's life insurance policies as assets of his estate, stating "Can it be that the Prosecutrix insists on her husband cashing in Life Insurance Policies in the total face value of $37,000.00 in which she and her children are beneficiaries, in order that his estate may be increased by the cash surrender value of $8,394.80?" This derision, however, cannot supplant governing legal rules that, in the matter of determining support potentiality, all of the husband's assets, and certainly life insurance policies are assets, and come across the computing table in determining the husband's capacity to pay for support.

In view of the above, it becomes necessary to remand the case so that the court, in determining what is due Mrs. Gitman and her children for support, will consider all of Mr. Gitman's actual earnings and perquisites, and the true nature and extent of his property and financial resources, as indicated in this opinion. Although the amount of the support order for the wife alone cannot exceed one-third of the husband's earning capacity, as so determined, it is well to note, as expressed in *Gutzeit v. Gutzeit,* supra, that "Considering the needs of the wife in this case and all the other circumstances which bear upon the proper sum to be paid by the husband, we think that the order should be close to the permitted maximum."

To this permitted maximum is to be added support for the three children. In this remand, the court below is requested to take prompt action, obtaining with dispatch all relevant evidence so that the husband may not alone enjoy the comforts and conveniences which his financial status assures him but so that his wife and children may also share in the comforts and conveniences which have been denied them since their departure for reasons the husband had no desire to question.

Decree reversed.

Mr. Justice COHEN, Mr. Justice EAGEN and Mr. Justice ROBERTS concur in the result.

---

DISSENTING OPINION BY MR. CHIEF JUSTICE BELL:

The Court of Quarter Sessions ordered defendant to pay $12,000 a year for the support of his wife and children. Mrs. Gitman, claiming the support was inadequate and unjust, appealed to the Superior Court, which affirmed the lower Court.

In a Per Curiam Opinion, the Superior Court affirmed the lower Court, and this Court allowed an Allocatur.

A support order must be based primarily (1) upon the income of the husband, and, under certain circumstances which it is impossible to define, upon his earning power, and (2) under certain circumstances upon the finances of the wife. Earning power is often so indefinite as to be realistically incapable of definition. Under the statute, a wife who has not been guilty of misconduct is entitled to an amount of support which is "*reasonable* and proper for her comfortable support and maintenance," and of course also for the comfortable support and maintenance of their children when the children live with the wife, considering the above mentioned factors and especially both the income and the earning power of the husband. A husband cannot evade this duty of support by so investing his assets as to restrict his earnings or cheat his wife of what the law says she is entitled to. His earning power should be considered only when he deliberately employs his capital assets for the sole or paramount intent to deprive his wife of the amount of support to which the law says she is entitled; and also in the situation where he deliberately refuses to work in order to cheat her, or fraudulently conceals his assets.

On the other hand, when a wife demands support for herself, her financial resources must be taken into consideration together with her husband's financial resources and income and earning power in order to fairly determine the amount of support to which she should be entitled. The majority Opinion has failed to take into consideration some of the aforesaid relevant and proper guidelines in determining support. *Com. ex rel. Gutzeil v. Gutzeit*, 200 Pa. Superior Ct. 401, 189 A. 2d 324, on which the majority relies is clearly distinguishable from the facts in the instant case.

I strongly disagree (a) that the assets of various corporations and (b) the life insurance policy which is payable to defendant's wife *and their children* are controlling, although at times they may be relevant factors in determining the amount of support.

I believe that the lower Court did not abuse its discretion in awarding $12,000 a year for the support of defendant's wife and children.

For the above reasons, I dissent.

---

DISSENTING OPINION BY MR. JUSTICE JONES:

The scope of appellate review on this appeal which involves the amount of an order of support for a wife and children is well settled.[1] In *Commonwealth ex rel. Marvin v. Marvin*, 193 Pa. Superior Ct. 179, 164 A. 2d 128 (1960), the Court said: "An order of support, based on competent evidence, will not be reversed on appeal. The law has placed upon the lower court the duty of deciding what sum is reasonable and proper

---

[1] In passing, I would note my disapproval of the allowance of an appeal in this case. Our Court, already burdened with a tremendous workload, should not be called upon to determine the propriety of orders in nonsupport cases. The Superior Court, with its vast experience in this area of the law, should be the court of last resort.

for the comfortable support and maintenance of a wife and children and determining whether the husband has sufficient ability to pay such sum. *Unless there is a clear abuse of discretion, the appellate court will not substitute its judgment for that of the trial judge.* [citing authorities].

. . .

"A trial judge who sees and hears the witnesses in a support action is in a better position tha[n] the Superior Court on appeal to decide the issue and its merits. [citing an authority]. It is the function of the [appellate court] only to review the testimony taken at the hearing and to determine whether the order can be sustained on any valid ground. [citing an authority]." (p. 181) (Emphasis supplied).

With that criterion in mind, I have read, in addition to the briefs of the parties, the entire voluminous record of testimony taken in the court of quarter sessions.

The opinion of Justice MUSMANNO insinuates that the court of quarter sessions failed to make a thorough study of the assets and earning power of Gitman, particularly, as to his financial interest in three corporations wherein he held a substantial stock-ownership, and, de-emphasized certain living expenses of Gitman charged off to one of these corporations; in my opinion, the record completely fails to sustain such insinuation or deemphasis. For the treatment in the opinion of Justice MUSMANNO of the impact on the amount of support which Gitman should pay of indebtedness owed by him upon which he is required to make payments of principal and interest and, particularly, for the suggestion that life insurance policies on Gitman's life, in which the wife and children are the beneficiaries, should be cashed and their cash value realized, I find no warrant in our case law.

I am convinced that the instant record does not show any abuse of judicial discretion upon the part of

the judge who, after hearing and observing the parties and their witnesses, made the instant order directing Gitman to pay $12,000 annually for the support of his wife and children.

Mr. Justice O'BRIEN joins in this dissenting opinion.