Commonwealth ex rel. Hauptfuhrer *v.* Hauptfuhrer, Appellant.

Argued March 26, 1973. Before WRIGHT, P. J., WATKINS, JACOBS, HOFFMAN, SPAULDING, CERCONE, and SPAETH, JJ.

*Henry T. Reath,* with him *Alan Reeve Hunt,* and *Duane, Morris & Heckscher,* for appellant.

*Desmond J. McTighe,* with him *McTighe, Brown, Weiss, Bonner & Stewart,* for appellee.

OPINION BY SPAULDING, J., September 19, 1973:

Appellant Henry Hauptfuhrer appeals from an order of the Court of Common Pleas of Montgomery County requiring him to pay $800 per week support for his wife Alberta, the appellee, and their three children. They have been married for 17 years, but separated since November 1971. As a result of their marriage there are three children, a boy age 18, and two girls, ages 13 and 16, who reside with appellee. Appellant does not deny his responsibility to support both mother and children. His sole contention on this appeal is that

the court erred in fixing the amount of support at $800
per week. He argues that the court below abused its
discretion in finding the needs of the family, in deter-
mining appellant's earnings, his earning capacity and
assets, and in finding that appellee had no earning
capacity with which to reduce the order of support.

"Generally we will not disturb a support order un-
less there is a clear abuse of discretion by the court
below in fixing the amount. Commonwealth ex rel. Long
v. Long, 181 Pa. Superior Ct. 41, 43, 121 A. 2d 888
(1956), or unless it is clear that the order is based on
a misinterpretation of the law." *Hecht v. Hecht,* 189
Pa. Superior Ct. 276, 281, 150 A. 2d 139, 142 (1959).
However, "[i]t is well established in Pennsylvania that
any order for support must be fair and not confiscatory.
[As to the children], [t]he purpose of such an order is
the maintenance and welfare of the children, not the
punishment of the parent, and the amount of the order
must be justified by the parent's present earning ability,
making due allowance for his own reasonable living ex-
penses. Commonwealth ex rel. Jacobson v. Jacobson,
188 Pa. Superior Ct. 433, 146 A. 2d 91 (1958) ; Com-
monwealth v. Wingert, 173 Pa. Superior Ct. 613, 98 A.
2d 203 (1953)." *Commonwealth ex rel. Goodman v.
Delara,* 219 Pa. Superior Ct. 449, 453, 281 A. 2d 751, 753
(1971). The purpose of a support order for a wife is,
similarly, to secure her a reasonable allowance, bearing
in mind the husband's earning capacity and property
and the station in life of the parties. *Commonwealth
ex rel. Fryling v. Fryling,* 220 Pa. Superior Ct. 68,
283 A. 2d 726 (1971) ; *Commonwealth ex rel. Kallen v.
Kallen,* 200 Pa. Superior Ct. 507, 190 A. 2d 175 (1963).
Again, the purpose is not to confiscate the husband's
property.

In *Hecht,* supra, Judge WOODSIDE said: "No two
support cases are ever alike. Circumstances, although
similar in some respect, may differ materially in other

respects. It is for the court to consider all the circumstances. It is difficult for an appellate court to state rules equally applicable to all cases. This case is unusual because of the wealth of the parents." 189 Pa. Superior Ct. at 281. The "wealth" involved in *Hecht* led this Court to increase a support order for two children to $550 per *month*. Here, the court below considered appellant to have sufficient "wealth" to pay $800 per *week* for the support of his family of four. It is fruitless, however, to merely compare dollar amounts in the instant case with the numerous precedents cited by the parties, which differ on their facts to a greater or lesser degree. Rather, we approach the mass of figures, estimates, and documents, comprising the testimony and exhibits, by considering appellant's arguments as they relate to all the circumstances of this case.

"It is the standard of living to which a family becomes accustomed that governs the calculation of a proper support order, consistent, of course, always, with the husband-father's income and assets." *Commonwealth ex rel. Gitman v. Gitman,* 428 Pa. 387, 395, 237 A. 2d 181, 186 (1967). "If the husband-father can afford for himself a caviar-champagne standard of living, it is not justice, nor legal, that the wife should be content with a tent and bread-and-butter menu for herself and brood." *Id.* at 394. The instant case presents a situation where the family has obviously become accustomed to a gracious standard of living, justifying a substantial support order. As stated by the lower court: "The family occupied an extremely high position in life and had a very affluent standard of living before the parties separated. However, there are limits to what a family can reasonably assert are its needs, especially where, as here, the life style of the family has elevated significantly during a short period of time before the parties separation and it is unlikely that, even had the family

remained together, this lavish standard of living would have continued at the same extraordinary level."

There was extensive testimony as to what is needed by this family in order to maintain its life style. Set out in the margin are appellant's and appellee's itemized estimates of these needs as garnered from the testimony and exhibits.[1] The various estimates totalled as follows: appellee claimed the family's expenses to be $870 weekly; appellant's counsel concluded that appellant testified to what calculated to be $370 per week

[1] COMMONWEALTH v. HAUPTFUHRER

| ITEMS | WEEKLY EXPENSES | |
| --- | --- | --- |
| | MRS. HAUPTFUHRER | MR. HAUPTFUHRER |
| Rent | None (house fully paid) | |
| Electricity and water | $ 20. | $ 7. |
| Heat | 15. | 15. |
| Repairs to house, appliances and furnishings | 60. | 10. |
| Food | 150. | 50. |
| Clothing | 75. | 25. |
| Medical | 5. | 5. |
| Dental | 40. | 40. |
| Hospitalization | 10. | 10. |
| Telephone | 15. | 10. |
| Taxes | 35. | 35. |
| Fire Insurance | 10. | 10. |
| Baby sitter, maid and gardener | 100. | 100. |
| Church | 5. | 5. |
| Recreation | 50. | 15. |
| Car Expense | 35. | 10. |
| Car Insurance | 15. | 10. |
| Wife's Personal Needs | 50. | 25. |
| Child's Personal Needs, horses, riding lessons, skating club, piano lessons and all allowances | 100. | 50. |
| Vacation | 30. | 15. |
| Miscellaneous, pharmacy, cleaners, window cleaning, gardening services, swimming pool maintenance | 50. | 25. |
| TOTAL | $870. | $472. |

expenses, and, after reviewing his testimony, we find appellant's estimate of expenses to more accurately be about $470 per week. The court below found appellee's testimony to be much more credible than appellant's and concluded that the family's needs and expenses are $870 per week. We concur with the lower court's finding that appellee's testimony was more worthy of belief than appellant's testimony. However, we cannot agree with its determination that the "needs" of the family were as great as appellee stated them to be.

It seems certain that appellee and her children are quite capable of spending any sum appellant is ordered to provide for them. At what point such monies would cease to be used for their needs ("needs being defined as what is reasonably required to maintain the family's welfare and station in life"), and be used for luxuries which appellant should not be required to provide is the question which we must answer here. In so doing, while we have given due consideration to the estimates of the parties, we are most impressed by the family's financial practices prior to the parties' separation.

Both parties agreed that prior to separating, appellant had been providing $2000 per month, or about $460 per week, for appellee, with which she met most of the household expenses. This sum represented an increase from a $1000 monthly allotment which appellant had been making prior to his father's death in 1970, when appellant received a substantial inheritance.[2] While the expenses paid from these monies varied, it was customary for appellee to pay the bulk of what she now claims as the family's living expenses with the $2000 monthly allotment. It also appears that appellant supplemented this amount by paying other

---

[2] This inheritance included, among other things, income from a trust fund established by appellant's grandfather in the amount of $26,000 per year and $60,000 as appellant's portion of stocks he and his sister received from his grandmother's estate. (N.T. 62)

family expenses, e.g., taxes, dental bills, etc. (N.T. 18-20). Since appellee will no longer be able to rely on appellant to meet such expenses, the amount of the support order must necessarily take into account such expenses.

The court below set the family's needs at $870 per week, implicitly determining that appellant had been paying $410 weekly for excess expenses, over and above the $460 per week allotment he made to appellee. We find that the record does not support appellee's assertion of such extensive "needs" above the $460 allowance. Without considering the excesses in appellee's estimate of the family's expenses on an item-by-item basis, we hold, after fully reviewing the record, that a more accurate approximation of the family's requirements is the sum of $600 per week. This figure, to which we reduce the support order, represents the $460 weekly allotment appellee has received prior to her separation from appellant, plus an additional $140 per week which we estimate to be the amount of excess expenses which appellant had been paying for from other monies.

We also note at this point that the court below reduced the amount of the family's requirements by $70 per week, which sum it found was required to pay for the children's education, but is provided by income from trusts which appellant has established for the children. We approve the court's determination that these funds should continue to be used for the children's education. We do not, however, see how this requires reduction of the amount of the family's needs by $70, since there is no claim by appellee that the support order should include an allocation for the children's education, and since the claimed expenses are $870 per week *exclusive* of the cost of the children's schooling. We therefore make no similar deduction from the $600 weekly award.

The court below approached the difficult task of evaluating appellant's earning capacity and assets, after considering the extensive testimony and exhibits in that regard, in its opinion, stating: "In the present case, the Respondent's income tax return is not a true measure of his financial situation and ability to pay. A more realistic picture of Respondent can be gathered by examining his cash flow for the year 1971; approximately Two Hundred Sixty-four Thousand Dollars ($264,000) was deposited by Respondent into his checking account in 1971, of this amount, Fifty-seven Thousand Seventy-eight Dollars ($57,078.00) represented the sale of securities. That amount was immediately used to repay a loan in which those securities were collateral. The remainder of those deposits came from Respondent's income and estate.

"The amount of depreciation claimed by Defendant on his personal income tax return, approximately Fifteen Thousand Two Hundred Ten Dollars ($15,210.00) was not considered when examining the Respondent's cash flow. As this deduction was taken upon income producing property, this Court felt it improper to treat this amount as spendable income.

. . . .

"The Respondent also borrowed approximately Fifty-eight Thousand Three Hundred Dollars ($58,300.00) from one of the family corporations in 1971. However, it must be noted that this corporation did not pay its only two shareholders, Respondent and his sister, any dividends in 1971 and that this corporation was organized with the primary intent of creating a tax shelter for the Hauptfuhrer family. Even considering this loan to be bona fide and deducting it from Respondent's cash flow, that amount still exceeded One Hundred Twenty Thousand Dollars ($120,000.00).

"The year 1971 was also one of substantial inheritance for Respondent. However, the greater part of

this inheritance was used to build additional equity in Respondent's business holdings. Very little, if any, of this money was spent by Respondent on personal needs for the family or himself. This inheritance did not substantially figure in Respondent's cash flow for the year 1971.

"The Respondent was also the possessor of a substantial estate, valued by him at Three Hundred Eighty-Four Thousand Dollars ($384,000.00). However, this valuation was based on net value of zero given the H & E Company. This Court found that Respondent's one-half interest in that company was worth approximately One Hundred Fifty Thousand Dollars ($150,-000.00). The true value of Respondent's estate would therefore exceed one-half million dollars.

"This Court found, and so determined, that Respondent is more than able to continue to support his family in the manner in which they were accustomed. It seemed little to ask a man to spend almost as much to support his wife and children as he spent at his Yacht Club in a single year."[3] We concur with the finding that appellant has sufficient income and assets to pay support in the amount of $600 per week, which we have found is required by the family to maintain its standard of living.

The appellant argues, *inter alia,* that the lower court erred by overstating appellant's assets, failing to sufficiently reduce them by his liabilities, adding depreciation and capital gains as income, and relying on appellant's 1971 cash flow which he alleges was of an extraordinary, non-recurring nature. We do not meet these contentions head on because we find evidence in the record that appellant admits sufficient income and assets to pay the amount of the order.

-----

[3] This refers to appellant's expenditures of approximately $50,000 at his yacht club during 1971. However, the great bulk of this expenditure was for the single purchase of a large yacht.

Appellant's reply brief states that:

"Counsel for Mrs. Hauptfuhrer has, we submit, overstepped the bounds of advocacy in stating . . . that Mr. Hauptfuhrer has a real income of 'at least $125,000 a year'.

"If her counsel had terminated their computation of Appellant's earning capacity [before adding in executors and trustees commissions, capital gains, and depreciation] . . . , they would have presented an accurate figure of Appellant's expected *gross* income of approximately $56,000." Appellant's reply brief at p. 14.

Appellant also admits that he received cash in the amount of $225,000 in 1971, but asserts that this money was either from non-recurring sources, was generated by the sale of capital, or was offset by liabilities. The substantial nature of appellant's assets is, however, admitted, since even "appellant urges this Court to adopt as the true measure of his net worth the statement of his assets and liabilities as of July 14, 1972, . . . The figure at the bottom of that statement is $205,073.14." Appellant's brief at p. 9. Merely recognizing income, assets, and cash flow which appellant admits justifies our conclusion that he possesses the financial capacity to pay $31,200 per year in support for the several years remaining until his children are no longer entitled to be supported by him.

Appellant's additional argument that he might be required to reduce his capital assets in order to pay the support order is not persuasive. The record reveals him to have made substantial maneuvers with his capital while spending more than $150,000 on himself and his family in 1971. Whatever, if any, reduction of assets would be necessary in order for him to pay the support order would be minimal compared to such extravagance, and would only be required to finance appellant's *own* indulgences, rather than pay a support order in an amount less than his admitted income.

The court below found that appellee could not be expected to generate any income by which the support order could be reduced, despite the fact that she had earned $8000 in 1971. The court indicated in its opinion that "Petitioner's income for that year of approximately Eight Thousand Dollars ($8,000.00) was also deducted from Respondent's cash flow, as this item was a nonrecurring one as Petitioner is no longer employed in the real estate business. That income was also not indicative of Petitioner's earning capacity, as the entire amount was received from one transaction with an old friend, which would not be repetitious [sic] in the future." As the record does not indicate that appellee ever worked at any regular employment during the parties' marriage, and since appellee is charged with the task of rearing three teen-age children, we conclude that the trial court did not abuse its discretion in refusing to make a deduction from the support order for her possible earning capacity.

The order of the court below ordering appellant to pay support is reduced to the sum of $600 per week and, as so modified, is affirmed.

