429 A.2d 665

**COMMONWEALTH ex rel. Ann C. HAGERTY**

v.

**William M. EYSTER II, Appellant.**

Superior Court of Pennsylvania.

Argued March 4, 1980.

Filed May 8, 1981.

564

Dale E. Anstine, York, for appellant.

J. Ross McGinnis, York, for appellee.

Before CERCONE, President Judge, and WATKINS and MONTGOMERY, JJ.

CERCONE, President Judge:

This is an appeal from an order of the York County Court of Common Pleas increasing the amount of child support appellant Eyster pays for the two children of his first marriage, now in their mother's custody, from $86 to $190 a week, plus an additional $20 a week until certain arrearages are paid off.

The objects of the support order are William M. Eyster III (Bill), born September 17, 1963, and Katherine Eyster (Kate), born April 12, 1968. Their parents divorced some time ago and both have remarried. Both children have hearing problems; Bill has the added misfortune of being afflicted with unspecified psychological disorders. Both require special educational attention: Bill is enrolled in a special preparatory school in Philadelphia, where he is a boarding student; Kate attends a private day school near her home. The parties do not dispute either the need for the special schooling, or the appropriateness of the schools chosen. The dispute centers rather around the amount each parent can or should pay towards meeting the childrens' educational needs.

Following the parties' divorce the former Mrs. Eyster married Fred D. Hagerty, M.D., a practicing private physician and eye specialist. Bill and Kate are in their mother's

custody. Dr. Hagerty, himself divorced, has two college aged children by his first marriage, for whom he pays support, in addition to the alimony he pays his first wife. The present Mrs. Hagerty, Bill and Kate's mother, is employed by her husband's professional corporation. In 1978 she earned $15,000 for her work there. Her federally taxed income in 1978 also included $3,940.00, being one half the net income from rental property which she and Dr. Hagerty own jointly. Her other income included $483.00 in stock dividends, $375.00 for premiums on life insurance paid by her corporate employer, and $1,002 in capital gains. Her net after-tax income in 1978 was $17,056.00.[1] Mrs. Hagerty's assets include a one-half interest in the jointly owned Hagerty medical center, which has a total value of between $230,000.00 and $242,000.00. She also owns $4,104.00 worth of P. H. Glatfelter, Inc. stock and a half interest in $12,500 worth of municipal bonds. Dr. Hagerty contributed $19,-000.00 towards the household expenses but neither the parties nor the lower court made any attempt to determine the exact amount of that figure which constituted voluntary contributions towards the support of Kate and Bill.

Mr. Eyster's 1978 income included $24,078.00 in salary from his employment with the Pfaltzgraff Company, $6,673.00 from a discretionary spray trust of which his grandmother is the principal beneficiary, and he a secondary beneficiary, and $2,000 in stock dividends and income from other investments. His after-tax income for 1978 was $27,-807.00.[2] Mr. and Mrs. Eyster (the second wife) jointly own their house, which is valued at $90,000.00. He also owns a $12,500 lot which he purchased as an investment, and a one-sixth interest in farm land in York County which has a total value of $300,000.00. His stock holdings totalled $21,-400.00, and he owns an investment account at National Central Bank which showed a balance of $69,000 at the time

1. The court placed her gross income at $20,800.00 and her estimated 1978 taxes at $3,744.00.

2. The court placed his gross income at $32,751.00 of which he paid $5,344.00 in taxes. He claimed both Kate and Bill as dependents.

of trial. The present Mrs. Eyster has two children by her first marriage who reside with her and her husband, the appellant. She intermittently receives $200.00 a month from her first husband for the children's support. The Eysters have one child of the present marriage as well. Mrs. Eyster is not employed.

Bill's weekly expenses total $175.60, the bulk of which would appear to be incurred because of the cost of his boarding school. Kate's weekly expenses were placed at $113.75. The total, $289.35, was found by the court to be both reasonable under the circumstances and necessary, and indeed, there is no dispute as to that finding.

Appellant raises two questions in his appeal: both claim abuse of discretion on the lower court's part. First he argues that the court abused its discretion in ordering the amount of support in question because it did not consider all of Mrs. Hagerty's resources. Second, he contends that the court's order is confiscatory and hence an abuse of discretion.

 It is well established that in evaluating a parent's support obligation the lower courts should consider the parent's income (or potential earning power if there is a disparity between that figure and actual income) and the full nature and extent of the parent's property interests and financial resources. *Commonwealth ex rel. ReDavid v. ReDavid*, 251 Pa.Super. 103, 380 A.2d 398 (1977); and see *Commonwealth ex rel. Gitman v. Gitman*, 428 Pa. 387, 237 A.2d 181 (1967); *Shuster v. Shuster*, 226 Pa.Super. 542, 323 A.2d 760 (1974); *Shaffer v. Shaffer*, 175 Pa.Super. 100, 103 A.2d 430 (1954). The parent's stock holdings, and other investments, at their market value, are among the factors the lower court should consider. *Commonwealth ex rel. ReDavid v. ReDavid, supra.* And see *Commonwealth ex rel. Gitman v. Gitman, supra; Commonwealth ex rel. Gutzeit v. Gutzeit*, 200 Pa.Super. 401, 189 A.2d 324 (1963). Quite naturally, the court should consider a parent's income, from whatever source; included in income should be monies received from the rental of real estate, but that "income"

must reflect actual available financial resources and not the oft-time fictional financial picture which develops as the result of depreciation deductions taken against rental income as permitted by the federal income tax laws. *Commonwealth ex rel. ReDavid v. ReDavid, supra; Commonwealth v. Turnblacer,* 183 Pa.Super. 41, 128 A.2d 177 (1956); *Commonwealth ex rel. Rankin v. Rankin,* 170 Pa.Super. 570, 87 A.2d 799 (1952). Otherwise put, "cash flow" ought to be considered and not federally taxed income. See *Commonwealth ex rel. Hauptfuhrer v. Hauptfuhrer,* 266 Pa.Super. 301, 310 A.2d 672 (1973). The court must also consider the parent's interest in jointly held assets, but it may not consider the entire value of joint property as the parent's, *Commonwealth ex rel. Gitman v. Gitman, supra.* Furthermore, if the parents of the child, the object of the action, have divorced, and if the parent from whom support is sought remarries, the property interest and income of the new spouse may not be considered in determining the parent's economic status, *Commonwealth ex rel. Travitzky v. Travitzky,* 230 Pa.Super. 435, 326 A.2d 883 (1974), except to the extent of the new spouse's voluntary contributions towards the child's support. *Mainzer v. Audi,* 266 Pa.Super. 122, 403 A.2d 124 (1979).[3] Furthermore, under Article I, Section 28 of our Constitution the obligation of support rests equally on the shoulders of both parents. *Conway v. Dana,* 456 Pa. 536, 318 A.2d 324 (1974); *Shapera v. Levitt,* 260 Pa.Super. 447, 394 A.2d 1011 (1978). Finally, the support order must be fair, non-confiscatory and based on all the circumstances of the parties at the time of the order. *Commonwealth ex rel. ReDavid v. ReDavid, supra.*

It is equally well settled that the Pennsylvania appellate courts will not disturb a lower court's order of support absent error of law or clear abuse of discretion. *Costello v. LeNoir,* 462 Pa. 36, 337 A.2d 866 (1975); *Commonwealth ex rel. ReDavid v. ReDavid, supra; Weiser v. Weiser,* 238 Pa.Super. 488, 362 A.2d 287 (1976).

**3.** Presumably the same would hold true for common law spouses, "posslqs," live-ins, paramours and other third parties to the marriage.

Appellant complains that the lower court did not consider the entire amount of his former spouse's financial resources in determining the level of support which he was ordered to pay. Specifically, he argues that the court did not consider Mrs. Hagerty's true income from the rental property which she owned jointly with her second husband, nor did it consider her "cash flow"—that is, the real amount of cash available for Bill's and Kate's support and not a "fictional" amount created by federal tax law, nor Dr. Hagerty's voluntary contributions to the children's support, nor her interest in certain municipal bonds jointly owned with Dr. Hagerty, nor certain pension contributions paid by her employer, nor her share in the Hagerty family residence. As explained hereinafter we find merit in none of these arguments save one; because we are in a position to modify the support order to cure the sole defect, we do so modify it, and as modified affirm its validity.

The court was correct in not attributing a property interest in the Hagerty residence to Mrs. Hagerty since the record shows the residence is owned solely by Dr. Hagerty. As for the alleged $6,524.00 in pension contributions, which appellant argues ought to have been included among Mrs. Hagerty's assets, the lower court found no evidence in the record supporting the contention of such a sum, or even that Mrs. Hagerty had any vested interest in a lesser sum, nor has appellant pointed to any support in the record for his claim. The record does reveal that the court counted Mrs. Hagerty's share in the jointly held municipal bonds, but, as with the alleged pension contributions we have nothing before us to indicate that Mrs. Hagerty received income in any amount from these bonds, and therefore, the court did not err in not considering undemonstrated income in determining its support order.

Appellant next argues that the court disregarded evidence which showed Mrs. Hagerty to have had $89,527.00 available to her for the support of her children. The evidence adduced at the support hearing clearly indicates that the $89,527.00 figure was not an accurate accounting of Mrs.

Hagerty's available "cash flow" or financial resources. Mrs. Hagerty and her husband had three joint checking accounts. The $89,527.00 appellant would have the court consider as Mrs. Hagerty's "cash flow" is the sum of all the checks drawn on those three accounts in 1978. All this is certain, but it is equally evident that much of this money was not strictly available for Bill's and Kate's support. As in many families, indeed probably most, no clear distinction was made between one spouse's resources and another's. Mrs. Hagerty paid the "family" bills even though some of those bills were strictly Dr. Hagerty's—e. g., the child support he had been ordered to pay for his two children in their mother's custody—and some were strictly Mrs. Hagerty's—e. g., the tuition and fees for the private schooling for Bill and Kate. The $89,527.00 worth of checks may have borne Mrs. Hagerty's signature but the sum does not represent her "available financial resources." We think the lower court was right to disregard the figure. The court did consider Dr. Hagerty's contributions to the household expenses, but the amount of these contributions is germane only insofar as they demonstrate voluntary contributions towards the support of Kate and Bill. The record nowhere reveals, nor has appellant argued, the extent of these voluntary contributions.[4]

4. Appellant contends that the contributions Dr. Hagerty made towards the household expenses amounted to $19,000, more or less. However, Mrs. Hagerty was never given any of the monies due her from the rental property and so, functionally, her husband's contributions ought to be diminished by the amount owing to his wife and thus increasing her expenditures in this area. This would make the doctor's contributions to household expenses $14,500.00 compared to $9,759.00 directly traceable to Mrs. Hagerty. The total expenditures by the couple on Dr. Hagerty's house, and its three fulltime inhabitants and one part-time inhabitant (Bill) is $23,737.00. Of this $2,549.00 for insurance can be fairly eliminated from the total since it represents more a protection of Dr. Hagerty's investment in the house than contributions to household expenses. The reduced total is thus, $21,288.00 of which Dr. Hagerty contributed $11,951. The difference is not significant.

The record does reveal that Dr. Hagerty spent $800.00 to pay for a vacation for his wife and Kate and Bill. It does not reveal what percentage of that was for the children.

■ We next consider appellant's argument that the court failed to consider $560.00 in income from rents received on the medical center. The court fixed Mrs. Hagerty's income from rents at $3,940.00. Appellant argues that this figure should have been adjusted to $4,500.00 based on Mrs. Hagerty's testimony at the support hearing. The $4,500.00 figure represents one half the gross income from the medical center less operating expenses, but not less depreciation expense allowable as a deduction from income under the federal income tax laws. The figure appellant advances is, then, the amount we have held to be correct, *Commonwealth ex rel Hauptfuhrer v. Hauptfuhrer, supra,* and it was therefore error for the court not to adjust Mrs. Hagerty's income to represent the sum actually available to her.[5]

■ Since we have held it was error not to adjust Mrs. Hagerty's available cash resources to reflect her actual liquidity and not the financial picture created by federal tax law it becomes necessary to modify the lower court's order. The lower court fixed Mrs. Hagerty's income, or cash resources, at $20,800.00 for 1978. Because that amount did not include the $560 deducted from gross income as allowable depreciation expense it should be readjusted to $21,360.00.

The court found appellant's 1978 after tax income to be $27,807.00. The total of appellant's and Mrs. Hagerty's cash resources before the adjustment is $48,607.00; of this figure appellant's share is 57.2% of the total. The total adjusted available cash resources figure is $49,167.00; appellant's share is 56.5%, representing a decrease of .7%. The combined assets total, not including the income amount, is $326,629.00, of which appellant's assets make up 59.8% of the

5. Careful study of the tax forms admitted into evidence shows that the 1978 rental income, less expenses but not less depreciation was $12,564.00 and not $9,000.00 as Mrs. Hagerty erroneously testified. This would make Mrs. Hagerty's share of the 1978 income $6,282.00 and not either $4,500.00 as argued by appellant, or $3,940.00 as found by the court. However, appellant has not argued the higher figure, choosing to rely on his former spouse's testimony and not her federal income tax forms.

total. Since appellant's share of the total available income resources has decreased it seems only fair to modify the support order by a similar percentage. Under the present order appellant pays 65.66% of the children's total support. We would reduce that percentage to 65%, for a dollar amount per week of $182.00.

Finally appellant argues that the support order is unfair and confiscatory. Although we are not bound by percentages or mathematical formula they are helpful in determining the fairness of a support order. We acknowledge the disparity between appellant's obligation under the modified support order to pay 65% of his children's support and his ownership of only 56.5% of the income available for that support, but Mrs. Hagerty is the custodial parent and the value of her contribution to the children's support by virtue of the non-economic benefits inherent in custody cannot be gainsaid. Neither the lower court's order nor our modification thereof obliges appellant to divest himself of his assets in order to support Kate and Bill, as he contends. The basis for this contention would appear to be the natural, if legally inaccurate, tendency on appellant's part to view his income as the source of support for his second wife, child and step-children. Legally, however, quite the contrary is true. Appellant's obligation vis-a-vis Kate and Bill arose long before his obligation to his new family. Of course, this is not to say that Mrs. Eyster and their daughter should go penniless for the sake of Kate and Bill, but only to recognize that the greater needs of the latter require their father to make some sacrifices. If appellant chooses to take bread from the mouths of his new family to feed other dependents rather than to bear the burden of sacrificing some of his property interests for the benefit of all concerned, that is his choice and not one which we have created. As for Mrs. Eyster's two children, who are appellant's step-children, the harsh legal reality is that appellant has no legal obligation to support them: that is a matter between their natural parents. Even in light of the moral obligation of support which appellant might be said to owe his step-children, we cannot

574

say that the modified order of support is either unfair or confiscatory.

The order of support requiring appellant to pay a total of $190.00 per week for the support of his children by his first marriage (Kate and Bill Eyster) is hereby ordered modified to $182.00 per week. The additional sum of $20.00 per week ordered to pay for arrearages which became due because of the retroactivity of the lower court's order is ordered modified to $10.00 per week until such time as the arrearages are paid off.

The order as modified is affirmed.