J-A08008-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| DONNA M. OLEY, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| NORMAN J. OLEY, | |
| Appellee | No. 187 MDA 2014 |

Appeal from the Order Entered January 9, 2014
In the Court of Common Pleas of Northumberland County
Civil Division at No(s): 09815-CV-14-142, PACSES NO. 602112782

BEFORE:  SHOGAN, WECHT, and STRASSBURGER,[*] JJ.

MEMORANDUM BY SHOGAN, J.:                **FILED JUNE 26, 2015**

This is an appeal in a support matter by Plaintiff-Appellant, Donna M. Oley ("Wife") from the January 9, 2014 order of the Northumberland County Court of Common Pleas.  We vacate and remand for further proceedings.

Wife and Defendant-Appellee, Norman J. Oley ("Husband"), married in August of 1987 and separated in October 2010, but they resided together until May of 2011 when Wife moved from the marital residence.  N.T., 8/7/13, at 8.  In the meantime, Husband filed for divorce on January 14, 2011.  N.T., 9/11/13, at 40.  The parties have four children, two of whom were minors at the time of separation.  N.T., 8/7/13, at 8.  One of the children achieved majority in October of 2012.  *Id*.  Only the youngest,

---

[*]  Retired Senior Judge assigned to the Superior Court.

presently age seventeen, remains a minor. *Id*. at 8–9. When Wife moved from the marital residence, the two minor children resided with her in Elysburg, Pennsylvania. Wife filed a complaint for child and spousal support and alimony *pendente lite* ("APL") on September 29, 2011. *Id*.

The trial court entered an interim support order utilizing the calculations of the Domestic Relations Section, wherein it determined that Wife's monthly net income was $1,749.24 per month and Husband's monthly net income was $5,424.85. Order, 1/20/12. The court ordered Husband to pay $1,327.00 per month in child support and $705.00 in APL, for a total monthly obligation of $2,032.00, effective September 29, 2011. *Id*. at 1–2. Husband received credit for $10,000.00, representing sixteen $625.00 weekly payments to Wife since the time she filed the support complaint. *Id*. at 3. Wife was ordered to provide health insurance for herself and the parties' children. *Id.*

Wife timely filed a petition for *de novo* hearing on January 26, 2012. Pending the *de novo* review, Husband filed a complaint for spousal support on October 4, 2012. After several continuances, a multi-day *de novo* hearing was held before President Judge Robert B. Sacavage[1] on August 7, 2013, September 11, 2013, and November 14, 2013.

---

[1] Judge Sacavage, who retired on January 5, 2014, did not file an opinion in support of the ultimate support order on appeal.

By order dated December 30, 2013, and filed January 6, 2014, Judge Sacavage bifurcated the divorce action and reaffirmed that the calculation of support would utilize the parties' incomes solely for the years 2010 and 2011. Order, 1/6/14. The order additionally dismissed Husband's complaint for spousal support. The court determined that Domestic Relations properly calculated both parties' incomes for those years. *Id*. Thus, by order dated January 7, 2014, and entered on January 9, 2014, the trial court determined Wife's monthly net income to be $2,105.14, and Husband's net monthly income to be $5,424.85, and ordered Husband to pay Wife $1,931.00 per month in child support and APL. Order, 1/9/14.

Wife filed a timely notice of appeal. The trial court, presumably due to the retirement of President Judge Sacavage, did not order the filing of a Pa.R.A.P. 1925(b) statement. New President Judge William Harvey Wiest filed Recorded Reasons in Lieu of Opinion on May 20, 2014, merely referencing the trial court's January 7, 2014 order.[2]

Wife raises the following issue for our review:

I.      Whether the lower court erred in affirming the calculation of [Husband's] monthly net income performed by Domestic Relations, who relied solely on [Husband's] 2010 Federal Income tax return, when:

---

[2] Due to multiple irregularities in the record that impeded this Court's consideration of the appeal, we were compelled to remand on November 24, 2014, for the proper completion of the record. The appeal has now been assigned to the instant panel for disposition.

- 3 -

> a. [Husband's] 2010 and 2011 tax returns inaccurately reported [Husband's] gross earnings?
>
> b. [Husband's] 2010 and 2011 income tax returns incorrectly reported Husband's earnings as one-half rental income on Schedule E. and one-half as income from a sole proprietorship on Schedule C, when his earnings were actually W-2 income, and should not have been reduced by expenses reflected on Schedule C and Schedule E?
>
> c. [Husband's] 2010 and 2011 income tax returns do not accurately reflect the money [Husband] had available for child support income, pursuant to 42 Pa.C.S. 4302?

Wife's Brief at 6.

The order appealed provides for child support and APL. We review APL awards under an abuse-of-discretion standard. **Childress v. Bogosian**, 12 A.3d 448, 463 (Pa. Super. 2011).

> APL is "an order for temporary support granted to a spouse during the pendency of a divorce or annulment proceeding." 23 Pa.C.S. § 3103. APL "is designed to help the dependent spouse maintain the standard of living enjoyed while living with the independent spouse." **Litmans v. Litmans**, 449 Pa. Super. 209, 673 A.2d 382, 389 (1996). Also, and perhaps more importantly, "APL is based on the need of one party to have equal financial resources to pursue a divorce proceeding when, in theory, the other party has major assets which are the financial sinews of domestic warfare." **Id**. at 388. . . . "APL focuses on the ability of the individual who receives the APL during the course of the litigation to defend her/himself, and the only issue is whether the amount is reasonable for the purpose, which turns on the economic resources available to the spouse."

**Id**. at 463 (citing **Schenk v. Schenk**, 880 A.2d 633, 644–645 (Pa. Super. 2005)).

- 4 -

The standard of review with respect to the amount of a child support award also is largely within the sound discretion of the trial court. ***Miller v. Miller***, 783 A.2d 832, 835 (Pa. Super. 2001).

> An abuse of discretion is not merely an error of judgment; if, in reaching a conclusion, the court overrides or misapplies the law, or the judgment exercised is shown by the record to be either manifestly unreasonable or the product of partiality, prejudice, bias or ill will, discretion has been abused.

***W.A.M. v. S.P.C.***, 95 A.3d 349, 352 (Pa. Super. 2014) (citation omitted). This Court may reverse a trial court's determination concerning support only if the court's order cannot be sustained on any valid ground. ***Spahr v. Spahr***, 869 A.2d 548, 551 (Pa. Super. 2005).

Importantly, this Court has held that support obligations are determined primarily by the parties' actual earnings. ***Woskob v. Woskob***, 843 A.2d 1247, 1251 (Pa. Super. 2004) (citing ***DiMasi v. DiMasi***, 597 A.2d 101 (Pa. Super. 1991)). Moreover, a party cannot voluntarily reduce his earnings in an attempt to circumvent a child support obligation. ***Grigoruk v. Grigoruk***, 912 A.2d 311, 313 (Pa. Super. 2006). Additionally, we note that "the duty to support one's child is absolute, and the purpose of child support is to promote the child's best interests." ***Morgan v. Morgan***, 99 A.3d 554, 557 (2014), *appeal denied*, ***Morgan v. Morgan***, ___ A.3d ___, 2015 WL 1542583 (Pa. 2015). Further, in determining a husband-father's financial obligation to his wife and children, "a court must make a thorough appraisal of the husband-father's actual earnings and perquisites, and the

true nature and extent of his property and financial resources." ***Labar v. Labar***, 731 A.2d 1252, 1254 (Pa. 1999).

At the hearing on August 7, 2013, Wife testified she worked for Francis Bobek, M.D., for twenty-seven years, which was substantially throughout the marriage. N.T., 8/7/13, at 9. Her gross earnings in 2010 were $20,748.31 and $21,478.00 in 2011. ***Id***. at 9–10.[3] Wife testified that Husband's source of income in 2010 and 2011 was from his fifty-percent ownership of Light & Heavy Supply Company, Inc. ("L&H Supply"), a company involved in the buying, refurbishing, and selling of mining equipment. N.T., 8/7/13, at 16–17. Wife testified that during the marriage, Husband received weekly checks of $3,000.00 from L&H Supply and bonuses three times each year, in April, July, and December. ***Id***. at 16, 23–24. Wife testified that the April bonus was used to pay the parties' income taxes, the bonus in July, typically $50,000.00, was used for their annual family vacation, and the end-of-the-year bonus typically was $100,000.00. ***Id***. at 24. Wife further explained that she utilized the joint bank statements to total the deposits Husband made into their joint account in 2010 and in 2011 from January 1, 2011, until she moved out of the marital home in May. ***Id***. at 29–30. In 2010, Husband deposited $194,578.00, and in the five-month period in 2011 when

---

[3] While Wife began a new job at Geisinger Health Plan in Danville, Pennsylvania, on January 31, 2012, at a higher salary, as we noted previously, the trial court confined its inquiry to calendar years 2010 and 2011. N.T., 8/7/13, at 11–12.

Wife remained in the marital home, he deposited $102,000.00. *Id*. at 30–31.

Husband's brother, Richard Oley ("Richard"), testified at the August 7, 2013 hearing. As noted, Husband owned fifty percent of L&H Supply and was the President; Richard owned the other fifty percent. N.T., 8/7/13, at 16, 50. Richard, who "paid the bills" and "did all the book work" for L&H Supply, testified that he wrote fifty-five $3,000.00 checks to Husband in 2010, which represented Husband's weekly pay. *Id*. at 53–54, 63–64. He testified that after May 2011, he did not issue any checks to Husband; rather, Richard's separate company, Black Diamond Mining, issued checks to L&H Supply. *Id*. at 74. To understand the intricate relationship of Black Diamond Mining and L&H Supply, and to gain an understanding of the change in Husband's salary before and after Wife left the marital residence, we review portions of Richard Oley's testimony, as follows:

> Q. [By Wife's counsel]: You are also on the books as one hundred percent owner of the Black Diamond Company . . . ?
>
> A. [Richard Oley]: I am the owner—or I was the owner of Black Diamond Mining. I sold the—corporation.
>
> * * *
>
> A. Black Diamond Mining was organized, was built because I wanted to have a preparation plant, a coal company to run.
>
> Q. . . . Do you agree that Black -- first of all, do you agree that [Husband] cannot mine because he's not permitted by the state to do so?
>
> A. That's correct.

Q.    Okay, and you agree that as long as [Husband] was a 50 percent owner of Light & Heavy, Light & Heavy could not conduct the mining on the property that Light & Heavy owned.  Is that correct?

A.    . . . It's correct, but there was no desire by Light & Heavy.

Q.    Okay, so Black Diamond is the company that you owned a hundred percent of on the books, and you leased the land from Light & Heavy.  Black Diamond did.  Excuse me.  Is that right?

* * *

Q.    Who owns the land that Black Diamond mined?

A.    At present?

Q.    No, sorry, 2010 and 2011 specifically.

A.    Black Diamond Mining owned the land.

* * *

Q.    Okay, so in November of 2011, as I understand it, Light & Heavy sold the land that they owned to Black Diamond?

A.    Correct.

* * *

Q.    I'm asking you whether your brother was involved in Black Diamond?

A.    As an owner?

Q.    Not as a legal owner.  Was he intricately involved in the day-to-day operations of Black Diamond?

A.    He was involved in the day-to-day. . . .

* * *

A.    Okay, from 2010 -- actually before that, but from 2010, on, [Husband] oversaw Light & Heavy employees --

Q.    Okay.

A.    -- on Black Diamond's site.

Q.    Okay.

A.    Okay, [L&H Supply] had a job to do.  They had several jobs to do.  They brought the material in from on site, although in 2010 our material on site diminished, and we start -- I start[ed] buying a lot of the material that was being put through the preparation plant.

But, as far as making the coal, preparing the coal on site, [Husband] was in charge of the employees on site.

* * *

Q.    Okay, so I'm going to reference specifically 2011's ledger, and I'm going to ask you to take a moment, please, to look at what you provided to me and tell me whether, after May of 2011, [Husband] received a paycheck from Light & Heavy Supply?

A.    No, there are no checks to him in that period.

* * *

Q.    [Husband] was -- excuse me, [Husband] was still working for Light & Heavy Supply Company.  Is that right?

A.    Yes, he was.

Q.    And he was still running bulldozers and operating a coal breaker for you?

A.    He was.

Q.    Okay, and he was still supervising employees?

A.    He was.

Q.    And it's your testimony he was not being compensated for that?

A.    Light & Heavy supply was being compensated for it.

Q.    So Black Diamond was paying Light & Heavy?

A.    They always paid Light & Heavy.

Q.    Okay, and this would have been for 2011.  It's my understanding from reading the deposition of the tax preparer that Light & Heavy had a -- received a 1099 invoice from Black Diamond at the end of 2011 for $138,000.00.  Would that be the money Light -- excuse me, Black Diamond was paying Light & Heavy for that particular service?

A.    I'm sure it was.

Q.    Okay, so what I understand your testimony to be then is that specifically from May of 2011 to December 31, 2011 Black Diamond paid Light & Heavy for [Husband's] services?

A.    There were no checks to him in that period.

Q.    Let me rephrase my question so you're not confused.

A.    Go ahead.

Q.    As I understand what you just said, Black Diamond in 2011 issued a 1099 for the money it paid to Light & Heavy for 2011 for services that [Husband] did for Black Diamond.  Is that what you're saying?

A.    It wasn't -- it wasn't services that [Husband] did.  It was services that Light & Heavy Supply did.

Q.    Okay, how was [Husband] compensated for his work from May of 2011 through the end of the year?

A.    Well, you have to understand --

Q.    No, answer my question, please.

A.    How is --

Q.    How was [Husband] compensated?

A.      He was not compensated obviously by Light & Heavy, or Black Diamond, or by me.   I don't know how he was compensated.

Q.      So he worked for free?

A.      May I finish what I was going to say before?

Q.      Did he work for free?

A.      He obviously did.

Q.      What were you going to say?

A.      When you're in business for yourself, and we've been in business by ourselves for a long time, there are periods of time when you may not have receivables coming in.  You may not have the sales that you need to generate an income, and there's been many occasions when neither one of us have taken a check from Light & Heavy Supply.

Q.      Except that Black Diamond alone issued a check, if I understand your testimony, for $138,000.00 in 2011.  So there was money coming in from Black Diamond.  Correct?

A.      There was.

Q.      And there was money coming in from other entities because your tax return reflects it.  Right?

A.      There -- there may or may not have been a lot of other income coming in at that time.

Q.      Well, in the documents that you provided to me the deposits for May of 2011 indicate that you had $118,000.00 come in for that particular month.  Would you like to see it?

* * *

Q.     . . . So if I go through and look $84,000.00 in the month of August, [$]26,000 in the month of September, [$]29,000 in the month of October, [$]28,000 in the month of November, [$]13,000 in the month of December.  This documentation was

- 11 -

provided to your tax preparer so that you had a 2011 tax return prepared for Light & Heavy. Is that right?

A.   That's correct.

Q.   Okay, do you recall in 2011 writing a check for $100,000.00 to [Husband]?

\* \* \*

A.   Yes, January 3, 2011, was a check for $100,000.00.

Q.   Why was [Husband] issued -- why was [Husband] issued a check in 2011, January of 2011, for $100,000.00?

A.   **It was a bonus that was taken from Light & Heavy Supply**.

Q.   We heard testimony from [Wife] that [Husband] typically received a bonus at the end of the year, and it was cashed in the beginning of the following year. Is that accurate? That certainly complies, or it falls in line with that testimony.

A.   This check is dated January 3, 2011.

Q.   Which is the date on which it was written?

A.   This is the date it was written. January 3, '11.

Q.   And when was it cashed?

A.   It wasn't my check. So I have no idea when it was cashed.

Q.   Well, those are your bank records. So I --

A.   **January 10, 2011** underneath. I'm sorry.

Q.   All right, so in January of 2011 you took $100,000.00 out right out of the gate?

A.   Yes.

Q.   Okay, did you take any money for a bonus?

- 12 -

A.    From Light & Heavy Supply?

Q.    Yes.

A.    No.

Q.    Did you take any money for Black Diamond?

A.    I may have, yes.

Q.    Okay, was it in the like distribution?    Did you get $100,000.00?

A.    I'm not sure.  It may have been.

Q.    You were also present when [Wife] spoke about taking -- [Husband] taking a lot of money out for -- in April of each year to take and pay his taxes.  Would that be what you recall as well?

A.    Again, I don't have the documentation in front of me.  I was asked to bring in 2010, '11 and '12.  There were bonus checks that were written out at different times of the year.

Q.    Including July when [Husband] would go on vacation.  Right?

A.    If the funds were available, and the company didn't suffer from it, there may have been, yes.

Q.    Okay, I don't have any other questions.  Oh, I'm sorry, I do have the rest of the subpoenaed documents I just want to be clear for the record.  Number 3 asked you for all invoices of Light & Heavy Supply issued to Black Diamond from January 2010 to the present.  Did you come prepared with those documents?

A.    Okay, as I told you previously, there were no invoices for the monies that were given to Light & Heavy from Black Diamond.

Q.    So there is no paper trail as to the work Light & Heavy did for Black Diamond and Black Diamond for Light & Heavy.  Right?

A.     A lot of the jobs that we had we would go out and do an estimated job even when we build a preparation plant that took in a lot of money, we would go out and give the customer [an] estimate of the cost.  If he agreed to the cost, he made payments to us.  There was [sic] never any invoices.  He made the payments, we got paid, and we did the job.

Q.     Okay, that's how it relates to the other entities, but I'm talking about specifically the work that was done for Black Diamond.  How do we know what Light & Heavy was owed at the end of the year if there weren't any invoices generated for the work done by -- on -- for Black Diamond?

A.     It was done on a weekly basis most times.  Whatever work was done during that week price was set on, and they were paid for the work.

Q.     Who set the price?

A.     We both sat down together because he was in charge of what was going on for Light & Heavy Supply, and I was the one writing the check out.  So we both had to agree on what was to be paid for their work.

Q.     Okay, so he was in charge of Light & Heavy Supply, and you were coming at it from Black Diamond?

A.     Correct.

Q.     Okay, but there was no paper trail to document the work done?

A.     No.

Q.     And the only money that would have been exchanged would have been a payment from Black Diamond to Light & Heavy, a check, is what you're saying?

A.     Correct.

Q.     No invoices to support the work done?

A.     No.

N.T., 8/7/13, at 50, 56–59, 66, 73–81 (emphasis added).

Thus, in 2010, Husband received a total of fifty-five $3,000 checks from L&H Supply, totaling $165,000.00. In 2011, L&H Supply paid Husband a total of $157,000.00 from January 1, 2011, through May 10, 2011, $100,000 of which was a bonus Husband received on January 3, 2011. Richard did not issue checks to Husband from L&H Supply after May 10, 2011, which coincided with the same time that Wife moved out of the marital home.

Husband agreed with Wife's testimony that he typically received a bonus in the amount of $100,000 "in the early part of the year," a bonus "in April to pay . . . taxes, and "in July for vacations." N.T., 9/11/13, at 5. Despite Richard's testimony that he did not issue L&H Supply paychecks to Husband beginning in May through December, 2011, Wife introduced Husband's bank statement showing weekly deposits ranging from $1,000.00 to $5,000.00 during that time that totaled $45,229.00. N.T., 9/11/13, at 7–15, 21. Husband's testimony concerning why he stopped receiving paychecks from L&H Supply was inconsistent and vague. At one point he testified that he stopped receiving paychecks from L&H Supply after May 10, 2011, "because I had reached the maximum money that I could take." N.T., 9/11/13, at 21. Curiously, he also stated that the deposits "appear to be . . . they would be probably paychecks." *Id*. at 9. When pressed, Husband confusingly testified that "those paychecks stopped mid year, and

then for the rest of the year I lived off some loans, and I lived off some cash from previous paychecks." *Id*. at 22. Husband answered all questions about his income tax returns similarly: "My accountant can probably answer that accurately. I don't know." *Id*. at 50.

Husband's testimony also was telling regarding his claim that he had no income from May to December, 2011. Husband made many references to his need for money. For example, Husband testified, "I know one thing for sure is I really wanted to sell that equipment for two reasons. First of all, it was old equipment. Second, I was going through a divorce and needed money." N.T., 9/11/13, at 34. At the same time, and despite Husband's claim of lack of income, the record reflects that when Wife left the marital home in May 2011, Husband made substantial improvements to the home, purchased a home theater, purchased new furniture, enhanced his in-ground pool, purchased dune buggies, gave his daughter $10,000.00, bought a truck for his son to use, and purchased a boat. *Id*. at 42–46, 52–54.

Wife argues the trial court erred in accepting the Domestic Relations Office's calculation of Husband's income. The Domestic Relations Office held Husband to $90,258.00 in gross earnings, using $10,939.00 reported on Schedule C as sole proprietorship income, and $79,319.00 in rental income reported on Schedule E on Husband's 2010 tax return. Order, 1/20/12, at 3. After deducting his estimated tax liability, the court determined that

Husband's annual net income was $65,098.20, or $5,42[4].85[4] per month. In the final order appealed, utilizing 2010 and 2011 federal tax returns, Husband's "net remains as $5,425.85 all along." Order, 1/9/14, at 3.

Wife asserts that at the support hearing, Gayle L. Bolinger, of Brown, Schultz, Sheridan & Fritz was qualified as an expert in forensic accounting and testified regarding Husband's disposable income available for support. N.T., 11/14/13, at 7–8. Ms. Bolinger opined that Husband's treatment of his wages on his 2010 federal tax return was improper because Husband was the President of a corporation, and he was compensated weekly for the services he rendered on behalf of the company. *Id*. at 102. Ms. Bolinger testified that pursuant to the Tax Treasury regulations, section 31.3121(D-1)(B), corporate officers specifically are included in the definition of employees for W-2 purposes, and therefore Husband's weekly pay should have been considered W-2 wages, and not rental income or income from a sole proprietorship. Wife's Brief at 22; N.T., 11/14/13, at 68, 102–103. Ms. Bolinger testified that it was improper to declare any portion of Husband's wages as Schedule C income (income from a sole proprietorship) because there was no evidence to suggest that Husband had any other

_____

[4] On page one of the final support order, the trial court describes Husband's net monthly income as $5,42**4**.85. On page three of that order, the trial court indicates that Husband's net monthly income is $5,42**5**.85. As the former amount comports with the prior interim order, we utilize $5,42**4**.85 as representative of Husband's net monthly income. Order, 1/9/14, at 1, 3 (emphasis added).

business interests other than the corporation L&H Supply. Ms. Bolinger determined that Husband's income should not have been reduced by $71,742.00, as the expenses were not proper deductions, and she ultimately concluded that Husband's net disposable income in 2010 was $155,799.00, or $12,983.00 per month. Wife's Brief at 12; N.T., 11/14/13, at 17.

Thus, Wife asserts that $165,000.00 should have been used for Husband's income. Wife's Brief at 31. Because Husband improperly reported his wages as rental income (Schedule E) and income from a sole proprietorship (Schedule C), Husband was able to reduce his earnings by $71,742.00. Wife contends Husband does not have ownership interest in any other business entity other than his one-half ownership interest in L&H Supply; thus, reporting his income on Schedule C as income from a sole proprietorship was error. Wife's Brief at 23. In addition, Wife maintains that deducting expenses reflected on Schedule C was error. Wife argues that the testimony at the hearing established that the wages Husband received were clearly for services he rendered and not rental income. *Id*.

As noted *supra*, despite Richard's testimony that he did not issue L&H Supply paychecks to Husband beginning in May through December, 2011, Wife introduced bank records showing typical, consistent weekly deposits during that time totaling $45,229.00, which Husband did not report as income on his 2011 federal tax return. N.T., 9/11/13, at 13–15, 21, 116. Husband never definitively explained the origination of these funds.

In response, Husband points to the parties' joint 2010 federal income tax return, which showed that $162,000.00 in total was paid to him from L&H Supply. According to the testimony of George Leonovich, the accountant for the company and the preparer of Husband's 2010 tax return, the $162,000.00 paid to Husband was reflected on L&H Supply's 2010 corporate income tax return on line 3 of Schedule A. The parties' 2010 tax return showed that one-half of the money received, $81,000.00, was received as rental income, and the other half, $81,000.00, was received as earned income. N.T., 9/11/13, at 116, Plaintiff's Exhibits 16 and 17.

Husband contends that the parties deducted expenses from the rental income, as reflected on Schedule E of the return, and also made various deductions from the earned income, as reflected on Schedule C. Husband asserts that pursuant to Pa.R.C.P. §1910-16.2(a)(2), income from business or dealings in property, for support purposes, should be the net income. As a result, Husband maintains that the net income earned from L&H Supply, which was attributed to Husband, was $90,258.00, as shown on lines twelve and seventeen of the parties' 2010 Form 1040. He avers this is the same amount that, when reduced by Husband's estimated tax liability, resulted in the $65,098.20, or $5,424.85 per month attributed as income by the Northumberland County Office of Domestic Relations. Husband's Brief at 7.

Husband relies on testimony from Mr. Leonovich that Husband, who was president of the company he and Richard owned, actually was a sole

proprietor and an independent contractor or subcontractor. N.T., 9/11/13, at 138–146. Husband suggests that the trial court "logically could have determined that [Husband] was being compensated" in the capacity of a subcontractor. Husband's Brief at 9. Husband asserts that if that were true, under IRS rules, Husband was permitted to deduct expenses on Schedule C. Husband's Brief at 10.

Husband's 2010 and 2011 federal income tax returns reported his earnings as one-half rental income (Schedule E) and one-half sole proprietorship income (Schedule C). In doing so, Husband deducted expenses permitted on those schedules and drastically reduced his actual earnings. For example, Husband's 2010 tax return reported $81,000.00 in income from a sole proprietorship (Schedule C). Husband was able to reduce this sum by the following expenses:

| | |
|---|---|
| $65,332.00 | Cost of Goods Sold |
| $720.00 | Office Expenses |
| $96.00 | Repairs and Maintenance |
| $334.00 | Taxes and licenses |
| $ 3,099.00 | Utilities |
| $480.00 | Other expenses |
| $70,061.00 | Total |

N.T., 9/11/13, at 116, Plaintiff's Exhibits 16, 17. As a result, even though Husband actually received $81,000.00 from L&H Supply, his tax return

showed a net of $10,939.00, which the Domestic Relations Office used in calculating Husband's income. Order, 1/9/14, at 3.

This case was not initially evaluated by a special master; thus, the record lacks a master's report. Likewise, the record lacks an opinion from the trial court explaining the court's reasoning. Here, neither Husband nor Richard described Husband as a sole proprietor; indeed, the consistent testimony was that Husband and Richard were each one-half owners of L&H Supply, a corporation.

Income is defined as follows:

"Income." Includes compensation for services, including, but not limited to, wages, salaries, bonuses, fees, compensation in kind, commissions and similar items; income derived from business; gains derived from dealings in property; interest; rents; royalties; dividends; annuities; income from life insurance and endowment contracts; all forms of retirement; pensions; income from discharge of indebtedness; distributive share of partnership gross income; income in respect of a decedent; income from an interest in an estate or trust; military retirement benefits; railroad employment retirement benefits; social security benefits; temporary and permanent disability benefits; workers' compensation; unemployment compensation; other entitlements to money or lump sum awards, without regard to source, including lottery winnings; income tax refunds; insurance compensation or settlements; awards or verdicts; and any form of payment due to and collectible by an individual regardless of source.

23 Pa.C.S. § 4302. Pa.R.C.P. 1910.16-2(c) lists the only deductions that are permitted from a party's gross income in the calculation of net income for support, as follows:

**Rule 1910.16-2. Support Guidelines. Calculation of Net Income**

\* \* \*

**(c) Monthly Net Income.**

(1) Unless otherwise provided in these rules, the court shall deduct **only** the following items from monthly gross income to arrive at net income:

(A) federal, state, and local income taxes;

(B) unemployment compensation taxes and Local Services Taxes (LST);

(C) F.I.C.A. payments (Social Security, Medicare and Self-Employment taxes) and non-voluntary retirement payments;

(D) mandatory union dues; and

(E) alimony paid to the other party.

Pa.R.C.P. No. 1910.16-2(c).

As noted *supra*, when determining a parent's financial obligation to his children, a trial court must make a detailed appraisal of the parent's actual earnings, perquisites, and the true nature and extent of his property and financial resources. *Labar*, 731 A.2d at 1254.

[I]n computing income available for support when the payor owns his own business, income must reflect actual available financial resources and **not the often times fictional financial picture which develops as the result of depreciation deductions taken against . . . income as permitted by the federal income tax laws.** Otherwise put, "cash flow" ought to be considered and not federally taxed income.

*Heisey v. Heisey*, 633 A.2d 211, 212 (Pa. Super. 1993) (quoting *McAuliffe v. McAuliffe*, 613 A.2d 20, 22 (Pa. Super. 1992)) (emphasis added).

Utilizing solely Husband's federal income tax return with its tax deductions, whether valid or not, as asserted by Wife, is an example of the "oft-time fictional financial picture" which develops as a result of the federal income tax laws. **Labar**, 731 A.2d at 1257. "'Cash flow' ought to be considered and not federally taxed income." **Id**. (citing **Commonwealth ex rel. Hagerty v. Eyster**, 429 A.2d 665, 669 (Pa. Super. 1981)). "[I]t is possible that a person could use a corporation to shelter income from the support obligation calculation . . . ." **Labar**, 731 A.2d at 1255.

On this record, we are unable to assess the propriety of the court's support decision. We have stated:

> Support orders "must be fair, non-confiscatory and attendant to the circumstances of the parties." **Fennell v. Fennell**, 753 A.2d 866, 868 (Pa. Super. 2000). "When a payor spouse owns his own business, the calculation of income for child support purposes must reflect the actual available financial resources of the payor spouse." **Fitzgerald v. Kempf**, 805 A.2d 529, 532 (Pa. Super. 2002) (internal quotation marks omitted). Further, "all benefits flowing from corporate ownership must be considered in determining income available to calculate a support obligation." **Fennell**, **supra** at 868 (emphasis added). "Therefore . . . the owner of a closely-held corporation cannot avoid a support obligation by sheltering income that should be available for support by manipulating salary, perquisites, corporate expenditures, and/or corporate distribution amounts." **Id**.

**Spahr**, 869 A.2d at 552.

That the Tax Code provides various opportunities for deductions and expenses in order to offset income does not mean that such deductions apply in the context of child support. In short, what is permitted by the IRS

is not always permitted by the domestic relations court. This Court, as well as our Supreme Court, has been very clear on that fact.

> It is well settled that "in determining the financial responsibilities of the parties to a dissolving marriage, the court looks to the actual disposable income of the parties." **Labar v. Labar**, 557 Pa. 54, 59-60, 731 A.2d 1252, 1255 (1999) (quoting **Cunningham v. Cunningham**, 548 A.2d 611, 612-613 (Pa. Super. 1996)). Moreover, the Pennsylvania Supreme Court has adopted the reasoning often employed by this Court that such "income must reflect actual available financial resources and not the oft-time fictional financial picture" created by the application of federal tax laws. **Id**. (citations omitted).
>
> We have held repeatedly that deductions or losses reflected on corporate books or individual tax returns are irrelevant to the calculation of available income unless they reflect an actual reduction in available cash. For example, in **Heisey v. Heisey**, 633 A.2d 211, 212 (Pa. Super. 1993), we considered the calculation of the income of a sole owner of an incorporated insurance business. We held that the trial court had erred in deducting from income "a 'loss' shown on the corporate federal income tax return that has no relevance in determining actual cash available for support." **Id**. **Accord McAuliffe v. McAuliffe**, 613 A.2d 20, 22 (Pa. Super. 1992) ("Depreciation and depletion expenses that are allowed under federal income tax law will not automatically be deducted from gross income for the purpose of determining support responsibilities."); **Flory v. Flory**, 527 A.2d 155, 157 (Pa. Super. 1987) (trial court erred by calculating [h]usband's income based on income reported on tax return alone; "federal income tax law permits deductions that may not reduce a parent's disposable income"). We have held as well that all benefits flowing from corporate ownership must be considered in determining income available to calculate a support obligation.

**Fennell v. Fennell**, 753 A.2d 866, 868–869 (Pa. Super. 2000).

Plainly, **Fennell** and the cases upon which it relies direct that the information set forth in tax returns does not automatically establish a spouse's income in the context of support. Rather, the case law recognizes

that when a court is attempting to determine the available income of a spouse who is paid by a corporation over which he has control, tax returns simply do not present the entire picture. The trial court must look beyond such information, must consider the purpose and effect of the tax events and/or decisions, and must emerge from such analysis with a genuine assessment of income available for support.

Accordingly, we must vacate the court's order and remand for further proceedings to allow the court to scrutinize Father's finances, take additional testimony, if necessary, and produce a detailed analysis capable of review.

Support order vacated; case remanded for further proceedings consistent with this Memorandum. Jurisdiction relinquished.

Judge Wecht joins the Memorandum.

Judge Strassburger files a Concurring and Dissenting Memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/26/2015